[No. C050683. Third Dist. May 25, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
DARRIN ERIC GUNDER, Defendant and Appellant.

**COUNSEL**

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Virna L. DePaul, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DAVIS, J.**—A jury convicted defendant Darrin Eric Gunder of two counts of first degree murder (sustaining related firearm enhancements) and of being a previously convicted felon in possession of a firearm, and sustained a multiple-murder special-circumstance allegation. The trial court sustained a recidivist allegation, and sentenced defendant to state prison for consecutive life terms without the possibility of parole (consecutive to a largely superfluous determinate term).

On appeal, defendant challenges the admission of evidence of uncharged criminal conduct, the admission of an extrajudicial statement of a recalcitrant witness, the sufficiency of the evidence to show premeditation, and the adequacy of a pattern instruction on the subject of giving defendant the benefit of the doubt on the degree of murder. We shall affirm.

As the evidence in support of the verdicts is relevant only to the contention regarding premeditation, we will not provide a separate recitation of the facts. Instead, we will incorporate the pertinent facts in the Discussion.

## DISCUSSION

### I

### A

In the course of examining the elder of defendant's twin teenaged sons, the prosecutor asked about a conversation defendant had had with him while bowling with them a couple of evenings before the murders[1] (which took place on Tuesday, Nov. 18, 2003). Defendant's brother had been living with defendant's mother but not paying any rent. Defendant went to his mother's house to evict his brother a few days before the bowling outing. An argument ensued, in which defendant's brother wielded a knife. Defendant told his son that he displayed a gun in his waistband to induce the brother's friend, who was there at the time, to back off. Defendant also told his son that he had asked the brother's friend afterward if the latter would have reported him for using the gun.

In the midst of this questioning, defense counsel objected, invoking Evidence Code section 352. At the next break, he expanded upon the basis for his objection, contending that the portion of the son's testimony in which defendant indicated he might have been ready to use the gun was not reflected in the son's statement and was highly inflammatory. The prosecutor asserted that the son's statement included his understanding that his father had indicated a readiness to use a gun on his person, which was relevant to proving that defendant possessed a gun shortly before the shootings. "That goes against the defendant's assertion that this evidence was somehow planted or mishandled with regard to the defendant."[2] The trial court over-ruled the objection.

---

[1] The victims were defendant's wife and mother-in-law.

[2] The prosecutor indicated the parties had discussed this matter previously in chambers, and did not further elaborate on the manner in which defendant might be asserting this claim of fabricated evidence (nor do the parties on appeal). We note, however, that in closing argument defense counsel suggested it was extremely unlikely that defendant (found with ammunition on his person and a gun consistent with the murder weapon under the seat of his truck) would still have had this evidence in his possession when he had a home meeting scheduled with a new parole officer shortly after the shootings (where he would be subject to search), or that the gun would be in a bag under the seat while the holster was found stuck to his back when police removed him from their vehicle at the police station. Defense counsel also found questionable that it took three patdown searches to find all the ammunition on his person, which nonetheless missed the holster.

## B

Instances of a defendant's conduct are inadmissible to prove a defendant's conduct on a specific occasion except where they are relevant to some fact in issue other than the defendant's disposition and their probative value outweighs any prejudicial value. (Evid. Code, §§ 352, 1101.) Defendant contends the trial court failed to indicate it had weighed the probative value against any prejudice to him. He also contends the incident lacked any probative value other than on his disposition to carry guns, because nothing linked the gun involved in that incident with the murder weapon.

Defendant explicitly invoked the statute mandating the balancing of probative and prejudicial value of evidence (Evid. Code, § 352) in making his objection before a highly experienced member of the bench, and thereafter argued the evidence was highly inflammatory (without apparently disputing its probative value); the prosecutor in turn reasserted the highly probative value of demonstrating that defendant had been in possession of a gun a few days before the shootings. Under these circumstances, the record is adequate[3] to show that the court weighed any prejudice from evidence of the incident against its probative value. (*People v. Garceau* (1993) 6 Cal.4th 140, 178–179 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

On the substance of the ruling, defendant invokes a rule precluding the admission of evidence that a defendant has other weapons in his possession " '*some time after the crime*' " where the prosecution knows the specific weapon used in a homicide, because such evidence proves only that the defendant is in the habit of possessing a deadly weapon and is not probative on the issue of whether he had possessed the particular weapon involved. (*People v. Cox* (2003) 30 Cal.4th 916, 956 [135 Cal.Rptr.2d 272, 70 P.3d 277], italics added, quoting *People v. Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1]; see *People v. Henderson* (1976) 58 Cal.App.3d 349, 353, 360 [129 Cal.Rptr. 844] [evidence that defendant had another firearm in his possession when arrested with firearm in hand used for assault].) This rule is inapposite to the present case, where defendant's possession of a firearm on two instances shortly *before* the shootings (the second of which we address in the next section) was relevant to refute his claim that the police planted the firearm found his possession. Thus, defendant is incorrect that the evidence lacked any probative value.

---

[3] We therefore do not need to address whether defendant's failure to obtain a settled statement of the earlier discussion of the issue in chambers forfeits this argument on appeal.

Defendant contends the prosecutor did not limit use of this evidence to proof of his possession of a firearm before the homicides, but instead invoked it in closing argument as proof of his propensity for violence. The first problem is that to the extent defendant suggests this is a species of misconduct, the lack of a contemporaneous objection forfeits the issue on appeal.[4] More importantly, the extent to which evidence demonstrates criminal propensity is simply a factor to consider in assessing the prejudice from its admission; it is not a basis for exclusion unless the evidence otherwise lacks any probative value. (*People v. Lewis* (2001) 26 Cal.4th 334, 373 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Alcala* (1984) 36 Cal.3d 604, 630–631 [205 Cal.Rptr. 775, 685 P.2d 1126].) As we have just discussed, the evidence is probative on the question of his actual possession of a firearm.

On the prejudice side of the scale, we are concerned only with the possibility of an emotional response to the proposed evidence that would evoke the jury's bias against defendant as an individual unrelated to his guilt or innocence. (*People v. Wright* (1985) 39 Cal.3d 576, 585 [217 Cal.Rptr. 212, 703 P.2d 1106].) Defendant asserts that the incident amounts to an uncharged crime, the prejudicial value of which is greater. The crime, however, relates only to his status as a previously convicted felon in possession of a firearm and was inherent in the offenses at issue. We do not discern any undue prejudice in the incident with defendant's brother such that we find an abuse of discretion on the part of the court in admitting it.

## II

### A

The prosecution called a longtime friend of defendant as a witness. He stated that he had known defendant for 15 to 20 years, and they socialized together, attending baseball games and concerts. When the prosecutor began to question the witness about events on the Sunday night before the murders, the witness claimed a lack of memory "because of medication," even after his review of a transcript of his January 2004 interview with investigators, and asserted a general inability to confirm his statements in the interview. Though he was able to remember a threatening message from defendant's wife in September 2003 (because he had written it down), he stated that he could not remember anything about defendant shooting himself in the ankle at an Indian casino in Jackson.

---

[4] As does its tangential inclusion under this heading in his brief. (*Smith v. City of Napa* (2004) 120 Cal.App.4th 194, 202 [14 Cal.Rptr.3d 908].)

Just before the prosecutor sought to play a tape of the interview with defendant's friend, defense counsel went on record to note that he did not have any basis for objecting to what was in his view proper impeachment, but defendant still wished to have his personal objection on the record. The jury thereafter heard the videotape and received a transcript of it. In this interview, defendant's friend described an incident at the casino early on the Monday morning before the shootings. Defendant put a gun in his coat pocket that fell through a hole in the pocket's bottom to the ground, where it discharged. The bullet pierced defendant's leg. Defendant's friend put the gun in the trunk. Defendant refused medical attention out of fear that it would be discovered he was a convicted felon in possession of a gun. Instead, they gambled for about an hour (defendant not seeming any worse for wear despite the bullet wound in his leg). They eventually arrived back at the friend's home in Lodi about 9:00 in the morning, where the friend tended to the wound as best he could. The friend unloaded the gun before returning it to defendant.

## B

On appeal, defendant contends his trial counsel was ineffective in two respects. First, trial counsel should have contested the admissibility of the friend's prior statement on the ground that the claim of memory loss at trial was genuine. Second, trial counsel should have asserted a violation of defendant's right to confrontation even if the prior statement was admissible as inconsistent with his testimony.

■ **1.** In order to admit the prior extrajudicial statement of a forgetful witness as an inconsistent statement, the forgetfulness must be feigned rather than the consequence of a float though the waters of Lethe. The determination is for the trial court, which we affirm if there is a reasonable basis in the record for its conclusion. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1219–1220 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

The present circumstances provide a reasonable basis for the court's implicit conclusion. The witness had been a friend of defendant for decades. He did not have any problem recalling the details of the casino incident a few months after it had occurred. The trial court, which had the benefit of observing the demeanor of the witness (as did trial counsel),[5] could find it improbable that the witness would not recall his friend shooting himself

---

[5] The record does not reflect trial counsel's exact reasoning in concluding that he did not have a basis for objection. For this reason, we may suppose for purposes of direct appeal that trial counsel could have concluded that the responses of the witness in connection with his demeanor would lead only to a conclusion on the part of the trial court that the claimed memory loss was feigned and thus any objection would have been futile. (*People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859].)

through the leg after dropping a gun in close proximity to the witness (which, as the witness recalled in the interview, angered him greatly and led him to "chew [defendant's] ass" on the trip home), while the witness could recall a threatening message from one of the victims merely because he had written it down. We find the interview properly admissible under state law as an inconsistent statement. (Evid. Code, § 1235.)

**2.** As for constitutional standards for admission of this evidence, *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] held that the right to confrontation precludes the admission of extrajudicial testimonial statements of witnesses who are not available at trial except where the defendant had an opportunity to cross-examine them on a prior occasion.[6] (*Id.* at p. 68.) The January 2004 interview with defendant's friend, in which he gave recorded responses to structured police questioning in the course of their investigation without any opportunity for defendant to cross-examine him, indisputably comes within this class of extrajudicial testimonial statements. (*Id.* at p. 53, fn. 4.) As "the Confrontation Clause places no constraints at all on the use of [the] prior testimonial statements" of witnesses who appear at trial (*id.* at p. 59, fn. 9), the question is whether a witness who appears at trial but feigns a lack of memory should nonetheless be considered unavailable, rendering the January 2004 interview inadmissible.

Defendant concedes that a witness with genuine memory loss is considered available for a defendant's cross-examination. (*United States v. Owens* (1988) 484 U.S. 554, 559 [98 L.Ed.2d 951, 108 S.Ct. 838].)[7] However, he cites a number of cases in which a witness entirely refused to testify, which either was considered a violation of the right to confront the witness at trial (*Douglas v. Alabama* (1965) 380 U.S. 415, 416, 420 [13 L.Ed.2d 934, 85 S.Ct. 1074]) or was the basis for a finding of unavailability to allow the admission of an extrajudicial statement (*People v. Rojas* (1975) 15 Cal.3d 540, 548, 552 [125 Cal.Rptr. 357, 542 P.2d 229]; *People v. Sul* (1981) 122 Cal.App.3d 355, 358, 364–365 [175 Cal.Rptr. 893]).[8] He asserts a witness who refuses to answer questions through a feigned memory loss should be deemed the equivalent of a witness who entirely refuses to answer questions.

---

[6] Where the defendant has brought about the unavailability of the witness, however, this extinguishes his ability to invoke his right to confrontation on equitable grounds. (See *Crawford v. Washington, supra*, 541 U.S. at p. 62.)

[7] He does advert to *People v. Simmons* (1981) 123 Cal.App.3d 677, 681 [177 Cal.Rptr. 17], which held to the contrary in connection with a truly forgetful witness. However, *Simmons* is not of any precedential value as it predates the controlling case of *United States v. Owens*.

[8] The latter are in fact irrelevant to the issue of the right to cross-examine, as a witness may be both unavailable for purposes of admitting hearsay evidence yet available to cross-examine. (*People v. Perez* (2000) 82 Cal.App.4th 760, 767, fn. 2 [98 Cal.Rptr.2d 522].)

■ The circumstance of feigned memory loss is not parallel to an entire refusal to testify. The witness feigning memory loss is in fact subject to cross-examination, providing a jury with the opportunity to see the demeanor and assess the credibility of the witness, which in turn gives it a basis for judging the prior hearsay statement's credibility. "[W]hen a hearsay declarant is present at trial and subject to unrestricted cross-examination . . . the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements." (*United States v. Owens, supra,* 484 U.S. at p. 560.) In the face of an asserted loss of memory, these protections "will of course not always achieve success, but successful cross-examination is not the constitutional guarantee." (*Ibid.*)

In light of this authority, a reasonably competent lawyer would not have bothered to assert an objection based on a violation of defendant's right to confrontation. As a result, we reject the defendant's argument.

### III

Defendant contends there is insufficient evidence of premeditation and deliberation in the murder of his estranged wife and mother-in-law. He shapes his argument in terms of the analytic paradigm articulated in *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], as a guide for appellate courts in assessing the sufficiency of such evidence, taking the discredited approach of using this template as a straightjacket on the manner in which premeditation can be proven adequately at trial. (*People v. Sanchez* (1995) 12 Cal.4th 1, 33 [47 Cal.Rptr.2d 843, 906 P.2d 1129] ["It is not necessary that the *Anderson* 'factors be present in some special combination or that they be accorded a particular weight' "]; *People v. Perez* (1992) 2 Cal.4th 1117, 1125, 1126 [9 Cal.Rptr.2d 577, 831 P.2d 1159] ["*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation"; the paradigm is not the sine qua non for proof of premeditation].)[9] We therefore consider his argument without belaboring the bullet points of planning, motive, and manner of killing on which *People v. Anderson* focused.

---

[9] That *People v. Anderson* might be the "seminal" case (as defendant asserts in his brief, citing *People v. Moon* (2005) 37 Cal.4th 1, 30 [32 Cal.Rptr.3d 894, 117 P.3d 591]), does not mean that the nature of appellate review of evidence of premeditation is frozen at the embryonic stage without further developments.

## A

Defendant and his wife were married on November 18, 1994. In April 1995, defendant was convicted of attempted murder and sentenced to state prison. Upon his parole in 2001, he reunited with his family. Defendant's family had a stormy relationship with him: he and his wife frequently quarreled (their teenage children often joining in the argument) during which he would threaten to kill them all and they would threaten him with calling his parole officer, and on occasion his wife threw him out of the house for as long as two to three months. His elder son refused to think of him as a father. On the other hand, there were times they enjoyed family activities together, and defendant would frequent casinos with his wife.

In August 2003, defendant told his parole officer that he was feeling stress from his mother's heart condition and from a deteriorating relationship with his wife. During a visit in September, he told his parole officer that he and his wife were separating because they were both miserable and he did not want to deal with the conflict any longer. The following week, both defendant and his wife told the parole officer that she wanted defendant out of the house, so he would be moving to San Joaquin County (his original county of parole). She told her son that she was concerned about defendant's ability to get along with her mother, who would be moving in because she needed home care. A longtime family friend also moved in, who had developed a relationship with defendant's wife (whom he had admired since they were in kindergarten).

Even after defendant left the home, he was a persistent caller. His son also saw him driving by the house repeatedly at all hours of the day and night in his truck. About 10 days before the murders, defendant and his wife spent the weekend together for his birthday. When they returned to the residence he shared with his mother, defendant's wife seemed angry and stormed off on foot to a nearby store to call her son for a ride home.

On the night before the murders, defendant's wife and her cohabitant friend had gone to the Jackson casino. The elder son was home when he got a phone call from his father asking for pain-killers. A few hours later, he was watching a movie when he saw defendant outside the sliding glass door. Defendant pulled up his pants leg and showed his son the self-inflicted gunshot wound from the other evening, and again asked for some pain-killers.

Defendant asked if his wife was home; his son told him she was out. Defendant said to tell her that he would be back early in the morning.

The cohabitant friend awoke the next morning (after returning from the casino with defendant's wife about 2:00 a.m.). When he left the house around 7:00 a.m., defendant was parked out front in his truck. Defendant mentioned the wound in his leg, which the friend assumed was from a nail gun that defendant used in his line of work. Defendant also said that he wanted to talk with his wife, but thought she might call the police. The friend agreed, and advised against it. They drove off in opposite directions at the intersection.

The son awoke shortly afterward. His mother mentioned that defendant had come by again around 3:00 a.m. When he left with his mother for school, he noticed defendant's truck parked down the street from their home. He did not see defendant.

Defendant came to his sons' school near lunchtime and checked them both out of classes for the remainder of the day, stating that it was for a medical reason. He took them to their home. When he arrived, his wife yelled at him for taking them out of school, and asserted that she would let the school know that he was not authorized to do this. Defendant looked calm. He left and returned in about five minutes with papers allowing the sons to return to school, and left again. The sons drove themselves back to school by the end of lunch.

In midafternoon, a neighbor saw defendant standing in the driveway of his wife's home. His truck was parked in front of the driveway. The neighbor asked about a dolly that defendant had borrowed. Defendant promised to look for it. As the neighbor drove off to the store, he saw defendant standing on the porch, apparently attempting to keep a column between himself and the neighbor's line of sight.

The cohabitant friend returned home about 3:00 p.m.; the elder twin arrived home at 3:30 p.m. Both the friend and the son left to attend to banking business. As the elder twin was driving on his errand, he saw defendant's pickup truck a few blocks from their home, heading in that direction. While the friend was at the bank, he received a call on his cell phone from the wife, who asked him to pick up the younger twin at school at 5:00 p.m.

When the son was unsuccessful in cashing the money order his mother had given him, he drove to his grandfather's house and called home to get further instructions. No one answered the phone. He tried unsuccessfully again in a few minutes, after which he headed home because he was worried that something was wrong. He walked in the front door, and did not notice his grandmother in her room to the left of the door or in the bathroom to the right. When he walked back into the living room, he saw his mother's body on the floor. He assumed defendant had done this, so he fled the house, drove to a friend's home, and called 911 at 4:51 p.m. When the cohabitant friend returned home with the younger twin, emergency response vehicles were already there.

Investigators arriving a few moments later found the backyard gate open. The sliding glass door had been almost entirely shattered and the screen door removed. The police had difficulty opening the front door because a wheelchair was blocking it. The grandmother was lying on her side in her room next to the front door with a point-blank gunshot wound to the head from which blood and grey matter had flowed. A drink was spilled next to her; the ice looked nearly unmelted. There was an expended casing near the wall. The wife lay in the living room; she had been shot point-blank in the back. There were two live rounds and one expended casing near her body.

Shortly afterward the police arrested defendant near his residence. They seized the ammunition on his person (and the holster stuck to his person) and the gun in his truck, and later found a wooden bat under the passenger seat with glass embedded in it. The gun had a malfunctioning firing mechanism, which required someone to push the slider forward manually between rounds and resulted in the ejection of live rounds.

### *B*

We would not describe the evidence of premeditation as overwhelming. Nonetheless, a rational trier of fact could properly infer the presence of premeditation from it.

Defendant had a tempestuous relationship with his wife, and apparently did not care for his mother-in-law. At the time of the murders, he was excluded from the family home, and another admirer of his wife was living with her. There had been a weekend with his wife that had turned out badly, and hours before the murders his wife castigated him for pulling their children out of school and forced him to undo his action. That this was their anniversary was

a circumstance to be taken into account, although it does not appear that anyone was expressly conscious of this fact at the time. In any event, there was certainly a reservoir of bad blood toward the victims on the part of defendant.

As for the shootings, it apparently took defendant some time to complete them. That he intended harm to the victims is a rational inference from the violent and exacting manner in which he broke into the home through the screen door. Once inside, he shot each victim at point-blank range, which indicates a more coldblooded approach to the shootings than a spur-of-the-moment impulse, if only because he needed to take time to approach the victim. Moreover, he took the time to reset his gun manually twice, because there were two live rounds ejected. The presence of a second victim in another room is indicative of premeditation in connection with the second killing.

Therefore, regardless of whether sufficient evidence is present from which one can infer planning activity significantly before the crime (given that defendant seemed to make a habit of carrying a gun, and it is not known whether or not he found the bat at the scene), the remainder of the circumstances indicate something other than impulse killings. Defendant's arguments to the contrary do not establish insufficient evidence, merely an alternative interpretation. As a result, we reject this claim.

## IV

Under California law, if a jury has a reasonable doubt as to the degree of an offense, it can convict a defendant only of the lowest degree. (Pen. Code, § 1097.)

The pattern instruction that the court read to the jury provided, "If . . . you unanimously agree that you have a reasonable doubt whether the murder was of the first or second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." (See CALJIC No. 8.71.)

Defendant contends this instruction violates due process because it conditions any juror's decision in favor of second degree murder on the unanimous

agreement of the jurors that a doubt exists as to degree. Defendant's appellate counsel acknowledges that he unsuccessfully raised the same argument before us in *People v. Pescador* (2004) 119 Cal.App.4th 252 [14 Cal.Rptr.3d 165]. He contends the present case is distinguishable.

We noted in *People v. Pescador* that the court there had also given a parallel pattern instruction on the subject of doubt as to degree that omitted any reference to unanimity as to doubt, as well as the pattern instruction reaffirming the duty of the individual jurors to decide the case for themselves rather than simply acceding to the majority. (*People v Pescador, supra*, 119 Cal.App.4th at pp. 256, 257.) After remarking that the Supreme Court did not criticize CALJIC No. 8.71 in *People v. Dennis* (1998) 17 Cal.4th 468, 537 [71 Cal.Rptr.2d 680, 950 P.2d 1035] (although the issue there involved whether another instruction intruded on the order of the jury's deliberations), we concluded that "[i]n light of the instructions as a whole" it was not reasonably likely that the jury interpreted CALJIC No. 8.71 as precluding a juror from voting for second degree murder absent a unanimous finding on doubt as to degree. (119 Cal.App.4th at p. 257; *People v. Frye* (1998) 18 Cal.4th 894, 957, 1025 [77 Cal.Rptr.2d 25, 959 P.2d 183] [interpretive standard for instructions].)

In the present case, the court did not instruct the jury with the parallel pattern instruction, but did make use of the pattern instruction on the duty of individual jurors to decide the case for themselves.[10] We disagree that this is a crucial distinction. If indeed it were reasonably likely that CALJIC No. 8.71 communicated the need for the procedural prerequisite of a unanimous finding of doubt as to degree, the parallel pattern instruction does not refute this any more directly than the instruction on the duty to deliberate individually. It is mere icing on the cake. What *is* crucial in determining the reasonable likelihood of defendant's posited interpretation is the express reminder that each juror is not bound to follow the remainder in *decisionmaking*. Once this principle is articulated in the instructions, a reasonable juror will view the statement about unanimity in its proper context of the procedure for *returning verdicts*, as indeed elsewhere the jurors are told they cannot *return* any verdict absent unanimity and cannot *return* the lesser verdict of second degree murder until the jury unanimously agrees that the defendant is not guilty of first degree murder. Thus, nothing in the instruction is likely to prevent a minority of jurors from voting against first degree murder and in favor of second degree murder.

---

[10] "Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself . . . . [¶] Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors, or any of them, favor that decision."

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Raye, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 15, 2007, S154077.