Filed 2/10/14  P. v. Frazier CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MAURICE FRAZIER et al.,<br><br>        Defendants and Appellants. | A134351<br><br>(Alameda County<br>Super. Ct. No. C161635AB) |

A jury convicted appellants Maurice Frazier and Lloyd Gary Townsend of murder (second and first degree respectively). Townsend and Frazier appeal, arguing that instructions to the jury (CALJIC Nos. 8.71, 8.72 (6th ed. 1996)) about the role of jurors' individual judgments in deciding between first and second degree murder and between murder and manslaughter reduced the prosecution's burden of proof and are constitutionally infirm. Frazier further argues that the trial court erred in denying his motion for a mistrial after the prosecution's violation of an in limine ruling, and Townsend contends that certain trial testimony by Frazier was prejudicial. We affirm.

## I.   BACKGROUND

On September 17, 2007, Frazier got into an argument with Willie Tatmon during a basketball game at the Poplar Recreation Center (Rec Center) in Oakland. Witnesses heard Frazier threaten Tatmon, saying "I should shoot you," and, "People think I'm a sucker, they don't know me. . . . Anybody can get it." Frazier was also heard to say, "Let me calm down before I smoke this fool." Frazier went outside, but returned a few

minutes later. He then shook hands with Tatmon and told him, "Everything is cool, Brother, it is good." Frazier then left.

When Frazier arrived at his home, he saw Townsend and relayed what had happened at the Rec Center. Townsend called his girlfriend, Miesha Lampkins, and asked her to take him to play basketball. Lampkins drove Townsend, Frazier and a third person identified as "Twan" back to the Rec Center. Frazier said that someone had gotten into his "face" there. When they arrived at the Rec Center, the men told Lampkins to wait for them. Lampkins parked her car outside the main entrance and waited with the car engine running.

Frazier, Townsend and Twan entered the Rec Center about 10 to 20 minutes after Frazier had previously left the center. Frazier identified Tatmon to Townsend, telling him, "That's that fool over there." Frazier walked over to Tatmon, and the two men began to argue. Townsend then pulled out a gun and fired approximately four shots inside the Rec Center. Tatmon ran outside with Townsend and Frazier following. Frazier fired two shots at Tatmon, who had collapsed outside. Townsend fired four or five additional shots at Tatmon. Frazier, Townsend and Twan ran to Lampkins's car and Lampkins drove away.

Tatmon died from multiple gunshot wounds. Three bullets had travelled through his body, and a nine-millimeter bullet entered into the right side of Tatmon's head, lodging in the left side of his brain. Four nine-millimeter shell casings were found inside the Rec Center, and five additional nine-millimeter casings were located outside in the area where Townsend was seen firing his gun. The nine-millimeter casings were all fired from a single firearm, a Glock nine-millimeter semi-automatic pistol. A .40-caliber shell casing was found just outside the door to the Rec Center, and a .40-caliber slug was found on the sidewalk directly across the street from where Tatmon was shot outside.

The day after the shooting, Lampkins had her black car painted red. Although she retracted her statement at trial, Lampkins told police that Townsend had told her to have the car painted and Townsend's sister had given her the money to do so.

Frazier was interviewed by Oakland police officers on September 20, 2007. In the tape recorded interview, Frazier initially denied involvement in the shooting but later admitted his participation. Frazier said that he had fired two shots from a .40-caliber Beretta but said he was not looking at Tatmon, who was eight or nine yards away. Frazier said he had the Beretta at the basketball game wrapped up in his shirt and jeans. He eventually told the police that it was Townsend who went back to the Rec Center with him. In a second taped interview on September 20, 2007, Frazier admitted that he had pointed his weapon at Tatmon when he fired it. Frazier again named Townsend as his confederate, blaming Townsend for the shooting.

At trial, Frazier testified that he became upset with Tatmon during the basketball game because Tatmon had been disrespectful to him. While Frazier could not remember the words he used, he was very angry and might have said something that could have been construed as a threat. After leaving the Rec Center, Frazier saw Townsend and told him that he had just "got into it with somebody over at the gym" and that he wanted to "whoop his ass." Townsend suggested they go back to the gym and called his girlfriend to give them a ride. At the Rec Center, Frazier approached Tatmon, looking for an opportunity to hit him. Frazier said he did not know Townsend had a gun and was shocked when Townsend shot Tatmon. After Tatmon ran out the door, Frazier said that he fired a shot without looking where he was shooting. Frazier claimed that he did so because of a "look" that Townsend gave him, which Frazier interpreted to mean that he "better do something too" and that Townsend might shoot him if Frazier did not also fire a shot. Outside of the Rec Center, Fraizer saw Townsend firing his gun. They then ran to Lampkins's car and drove away. Frazier said he gave his gun to Townsend to discard. Frazier insisted that he had only intended to "jump" Tatmon with Townsend, and that he did not intend to shoot Tatmon or to encourage anyone else to do so. Townsend did not testify.

### The Mistrial Motion

Prior to trial, the prosecution moved to admit, as impeachment of Townsend in the event he testified, evidence of a shooting that had occurred in front of Frazier's house in

3

January 2007.[1] The description of the shooter in that case matched Townsend, and the description of a car used matched Lampkins's car. The trial court found that there was insufficient evidence that Townsend was the shooter in the prior incident and that there was no evidence that Frazier was present. The court declined to admit any evidence of the 2007 shooting.

At trial, during the direct examination of an inspector for the district attorney, Louis Cruz, the prosecution explored the manner in which Frazier had been identified as one of the individuals responsible for shooting Tatmon. Cruz explained that a witness to the shooting had identified a house on Chestnut Street where he had seen Frazier. Cruz testified that in attempting to identify Frazier, "[Sergeant] Basa and I drove with [the witness] out to Chestnut where he pointed out a house and then we drove back to the police department. [¶] The house was important to us because [the witness] had said that he had seen [Frazier] at this house, in front of the house, somehow associated with the house. So we thought maybe we could use the house to try to figure out who [Frazier] was. [¶] When we got back to the police department then there was another conversation with Sergeant Rullamas who was investigating a different murder at that house, and that's how we finally were able to figure out who [Frazier] was."

Frazier's counsel objected, and the court called a recess and excused the jury. The next day, both Frazier and Townsend moved for a mistrial. After inquiry of the prosecutor and Cruz, the court found that there had been a violation of its in limine order, but concluded that the violation was "gross negligence" rather than intentional misconduct. The court found that without an admonition the evidence would be highly prejudicial as to Frazier and focused on whether an admonition to the jury would be sufficient to address any potential prejudice. The court concluded that any prejudice from Cruz's testimony could be cured by a combination of a stipulation that Cruz had

---

[1] The prosecution also sought to introduce evidence of an April 2007 shooting incident, not at issue here, in which nine-millimeter shell casings found at the scene matched those found at the scene of the Tatmon shooting.

misspoken when he said that a murder had occurred at the house, advising the jury that Frazier was never a suspect in the other murder investigation, and an admonition that the jury should disregard Cruz's remark.

The court read the following stipulation and admonition to the jury: "On Wednesday, August 17th, 2011, . . . Cruz . . . referred to an investigation of an unrelated murder that took place quote, at, end quote, Defendant Frazier's house. This reference to Defendant Frazier's house is inaccurate. . . . Cruz's statement may have left some of you with the misimpression that Mr. Frazier was involved in that homicide. It is not true that Mr. Frazier is or ever was suspected of any involvement in that shooting. [¶] That shooting took place on the street that runs in front of Mr. Frazier's family residence. Witnesses stated the shooting was perpetrated by one person. Descriptions of that person eliminated Defendant Frazier as a possible suspect. There is no evidence whatsoever that Mr. Frazier was involved in that homicide in any way or had any knowledge about it. A police canvass of the residents in that block of Chestnut Street had indicated that one of the residents was named Maurice. That information led to the discovery of a DMV photo of the defendant which was then shown to [the Tatmon shooting witness]. [¶] . . . [¶] . . . [T]he bottom line here is that unrelated murder is unrelated. We're not going to spend any more time in this trial on that event that has nothing to do with this event." The court denied the mistrial motion.

*Jury Verdicts and Sentencing*

The jury convicted Townsend of first degree murder and Frazier of second degree murder (Pen. Code, §§ 187, 189). Firearms enhancement allegations were found true as to both Townsend (Pen. Code, §§ 12022.53, subds. (c) & (d), 12022.7, subd. (a)) and Frazier (Pen. Code, § 12022.53, subd. (c)). On January 6, 2012, Townsend was sentenced to a term of 50 years to life in state prison. Frazier was sentenced to a term of 35 years to life.

5

## II. DISCUSSION

A. *1996 Versions of CALJIC Nos. 8.71 and 8.72*

Townsend challenges two instructions given to the jury, CALJIC Nos. 8.71 and 8.72 (6th ed. 1996).[2] He argues that the instructions lowered the prosecution's burden of proof for first degree murder, thereby violating his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

The People contend that the claim has been forfeited by both defendants' failure to object, or to request clarifying or amplifying instructions in the trial court. (*People v. Bolin* (1998) 18 Cal.4th 297, 328 [defendant waives issue on appeal if the instruction correctly states the law, and defendant did not request clarification or amplification].) We disagree. Failure to object to an instruction does not waive a claim of error if the instructional error affected the defendant's substantial rights. (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.) In any event, we reject the claim of instructional error on its merits.

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) When considering a challenge to a jury instruction, we do not view the instruction in artificial isolation but rather in the context of the overall charge. (*People v. Espinoza* (1992) 3 Cal.4th 806, 823–824; *People v. Pescador* (2004) 119 Cal.App.4th 252, 257 (*Pescador*) [correctness of jury instructions determined from entire charge, "not from a consideration of parts of an instruction or from a particular instruction"]; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [appellate court " ' "must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given" ' "].) "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. [Citation.]" (*People v. Mayfield* (1997) 14 Cal.4th 668, 777.)

---

[2] Frazier, who filed his opening brief prior to Townsend, filed a joinder in this argument on July 10, 2013.

The jury was instructed on the elements of murder and manslaughter. The jury was further instructed that "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by a defendant, but *you unanimously agree that you have a reasonable doubt* whether the murder was of the first or of the second degree, you must give defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree as well as a verdict of not guilty of murder in the first degree." (CALJIC No. 8.71, italics added.) The jury was also told that "If you are convinced beyond a reasonable doubt and unanimously agree that the killing was unlawful, but *you unanimously agree that you have a reasonable doubt* whether the crime is murder or manslaughter, you must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder." (CALJIC No. 8.72, italics added.)

Townsend argues that the then current CALJIC Nos. 8.71 and 8.72 "[i]n substance . . . told jurors that unless they had unanimous reasonable doubt as to degree of murder, a verdict of first degree was required by operation of law; and unless they had unanimous reasonable doubt as to murder vs. manslaughter, a verdict of murder was required by operation of law[.]" He relies on our Supreme Court's criticism of these instructions in *People v. Moore* (2011) 51 Cal.4th 386 (*Moore*). The *Moore* court considered whether the 1996 versions of the instructions[3] were "reasonably likely to be understood and applied in an unconstitutional manner." (*Id.* at p. 410.) The court concluded that the language in CALJIC Nos. 8.71 and 8.72 addressing the role of reasonable doubt in

---

[3] After *Moore* was decided, CALJIC Nos. 8.71 and 8.72 were amended to remove the contested unanimity language. The current version of CALJIC No. 8.71 (Fall 2013 ed.) states: "If any juror is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but has a reasonable doubt whether the murder was of the first or of the second degree, that juror must give defendant the benefit of that doubt and find that the murder is of the second degree." The current version of CALJIC No. 8.72 (Fall 2013 ed.) states: "If any juror is convinced beyond a reasonable doubt that the killing was unlawful, but that juror has a reasonable doubt whether the crime is murder or manslaughter, that juror must give the defendant the benefit of that doubt and find it to be manslaughter rather than murder."

choosing between greater and lesser homicide offenses, was unnecessary in light of other instructions conveying the principle that the jury as a whole may not return a verdict for a lesser included offense unless it first reaches an acquittal on the charged greater offense, and therefore "the better practice is not to use the 1996 revised versions of CALJIC Nos. 8.71 and 8.72, as the instructions carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter." (*Moore,* at p. 411.) However, the court found that, under the facts of that case, any confusion generated by the challenged instructions could not have affected the jury's verdicts and that any error was harmless beyond a reasonable doubt. (*Id.* at p. 412.)

*Moore* discussed two decisions of the Third District Court of Appeal that rejected the challenges to the 1996 versions of CALJIC Nos. 8.71 and 8.72 made here. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 424–425 (*Gunder*); *Pescador, supra,* 119 Cal.App.4th at pp. 255–258.)

In *Pescador*, the defendant similarly argued that CALJIC Nos. 8.71 and 8.72 violated "his due process rights by allowing a jury to make a determination of guilt on an element of the crime where one or more jurors may have had reasonable doubt[,]" and that "the instructions force[d] individual jurors who had a reasonable doubt as to [either] the degree of murder (CALJIC No. 8.71), or as to whether the crime was murder or manslaughter (CALJIC No. 8.72), to conclude they [could] not give the defendant the benefit of the doubt in reaching their own individual determinations as to the degree of the offense." (*Pescador, supra,* 119 Cal.App.4th at pp. 255–256.) The *Pescador* court found that the jury was correctly instructed in light of the instructions as a whole (*id.* at pp. 257–258), including CALJIC No. 17.11 ("reasonable doubt as to whether [defendant's guilt of a crime] is of the first or second degree, you must find him guilty of that crime in the second degree"), CALJIC No. 17.40 (parties entitled "to the individual opinion of each juror" and jurors "not [to] decide any question in a particular way because a majority of the jurors, or any of them, favor that decision"), and CALJIC No. 8.50 ("[t]o establish that a killing is murder and not manslaughter, *the burden is on*

*the People to prove beyond a reasonable doubt each of the elements of murder* and that the act which caused the death was not done in the heat of passion or upon a sudden quarrel" (italics added)).

In *Gunder,* the defendant was also convicted of first degree murder and again contended that CALJIC No. 8.71 "conditions any juror's decision in favor of second degree murder on the unanimous agreement of the jurors that a doubt exists as to degree." (*Gunder, supra,* 151 Cal.App.4th at pp. 424–425.) The trial court there did not give CALJIC No. 17.11, but did give CALJIC No. 17.40 on the duty of individual jurors to decide the case for themselves. (*Gunder,* at p. 425.) The *Gunder* court found this not to be a crucial distinction. "If indeed it were reasonably likely that CALJIC No. 8.71 communicated the need for the procedural prerequisite of a unanimous finding of doubt as to degree, the parallel pattern instruction does not refute this any more directly than the instruction on the duty to deliberate individually. It is mere icing on the cake. What *is* crucial in determining the reasonable likelihood of defendant's posited interpretation is the express reminder that each juror is not bound to follow the remainder in *decisionmaking.* Once this principle is articulated in the instructions, a reasonable juror will view the statement about unanimity in its proper context of the procedure for *returning verdicts,* as indeed elsewhere the jurors are told they cannot *return* any verdict absent unanimity and cannot *return* the lesser verdict of second degree murder until the jury unanimously agrees that the defendant is not guilty of first degree murder. Thus, nothing in the instruction is likely to prevent a minority of jurors from voting against first degree murder and in favor of second degree murder." (*Gunder,* at p. 425.)

The Supreme Court in *Moore* did not question (nor did it expressly endorse) the reasoning or result in *Pescador,* and found it unnecessary to decide "whether *Gunder* was correct that the possibility of confusion is adequately dispelled by instruction with CALJIC No. 17.40 on the jurors' duty of individual decision." (*Moore, supra,* 51 Cal.4th at p. 412; see *id.* at p. 411 [trial court in *Moore* did not give CALJIC Nos. 17.11 or 8.50].)

In the matter before us, the court gave CALJIC No. 17.10 in addition to CALJIC Nos. 17.11 and 17.40. As given to the jury here, CALJIC No. 17.10 provided: "If you are

9

not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict him of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime. [¶] Thus, you are to determine whether the defendants are guilty or not guilty of the crime charged in Count One [(murder)], or of any lesser crimes. In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it. You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdicts. However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the charged greater crime." The jury was also instructed generally as to reasonable doubt (CALJIC No. 2.90) and was told to consider the instructions as a whole (CALJIC No. 1.01). We presume that the jury is capable of following the instructions as given. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1337.)

We agree with *Gunder's* conclusion that *"*[w]hat *is* crucial in determining the reasonable likelihood of defendant's posited interpretation is the express reminder that each juror is not bound to follow the remainder in *decisionmaking.*" (*Gunder, supra*, 151 Cal.App.4th at p. 425.) The unanimity language of CALJIC Nos. 8.71 and 8.72 is framed in terms of *returning verdicts,* not individual juror *decision making.*

We find no reasonable likelihood on the record before us that the jury misconstrued the instructions or misapplied the law. The trial record in fact clearly demonstrates that the jurors here were not confused by CALJIC Nos. 8.71 or 8.72. The jury began deliberations on the afternoon of August 31, 2011. The next morning, the jurors sent a note to the court focusing on CALJIC No. 17.11 and asking if the instruction directed them to return a verdict of *second degree murder* if there was unanimity on murder, but disagreement as to degree. The court responded that the issue of reaching unanimity was within the jury's discretion.[4] Shortly thereafter, the jury foreperson

---

[4] The court advised the jury to see CALJIC Nos. 17.40 [parties entitled to individual opinion of each juror] and 17.50 [all twelve jurors must agree], and suggested

advised the court that they had reached a verdict on one of the defendants, but were deadlocked on the second. At 3:25 p.m. on September 1, 2011, the jury returned its verdict finding Townsend guilty of first degree murder. The jury continued deliberating on Frazier's case for a matter of days thereafter, returning the second degree murder verdict on September 6, 2011. Before doing so, the jury sent notes to the court indicating lack of unanimity as to the degree of murder as to Frazier, and inquiring about aider and abettor liability and the mental state required of an aider and abettor where the principal (Townsend) had been convicted of first degree murder. The jurors quite obviously unanimously rejected manslaughter as a possible verdict almost immediately (rendering CALJIC No. 8.72 irrelevant), and quite clearly understood that their individual judgments were required in determining the degree of murder for both Townsend and Frazier. The jurors' questions and the differentiated verdicts amply demonstrate that the jurors did not view first degree murder as the "default" verdict in the event of lack of unanimity.[5] There was no error.

B.    *Frazier's Mistrial Motion*[6]

Frazier argues that the trial court erred in denying his motion for mistrial. "In reviewing rulings on motions for mistrial, we apply the deferential abuse of discretion standard. [Citation.] 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]'

---

that CALJIC Nos. 17.10, 8.71, 8.74 and 17.11 might be helpful. All counsel agreed to the content of the court's response.

[5] For the same reasons, we would conclude that any error was harmless, whether applying the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 [not reasonably probable that a more favorable result would have been achieved in the absence of error]) or the more stringent *Chapman* test (*Chapman v. California* (1967) 386 U.S. 18, 24 [beyond a reasonable doubt error did not contribute to the verdict]).

[6] Townsend does not raise this issue on appeal.

[Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) "[A] motion for mistrial should be granted only when ' "a party's chances of receiving a fair trial have been irreparably damaged.' " ' (*People v. Ayala* (2000) 23 Cal.4th 225, 282.) We find no abuse of discretion.

Frazier first asserts that the trial court erroneously concluded that it could not grant a mistrial because it found that the violation of the in limine order was not intentional. This is a mischaracterization of the record. The court stated that it read *People v. Navarette* (2010) 181 Cal.App.4th 828 as requiring grant of a mistrial if it found an intentional or willful violation of its in limine order. In *People v. Navarette*, the court found it to be an abuse of discretion to deny a motion for mistrial where a testifying detective, in bad faith and with intent to prejudice the jury, referenced a statement by the defendant that the trial court had ruled inadmissible. (*Id.* at pp. 831, 834.) The trial court here did not, however, state that it viewed a determination of willfulness, or lack thereof, as ending the inquiry. Instead, the court clearly indicated that it was proceeding "one step at a time," and that determining whether the violation was intentional was only the first step in its analysis. The court then focused on the question of whether any prejudice resulting from the testimony could be cured. "Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction. [Citation.]" (*Id.* at p. 834.)

Frazier also contends that the court utilized an incorrect legal standard in "appl[ying] a post-conviction prejudice test [harmless error] to pre-conviction misconduct" and that we should therefore accord no deference to the ruling. Again, the trial court did no such thing. The court said only that it read case authority to permit it to consider the strength of the evidence against Frazier as a "factor" in determining the degree of prejudice and the necessity for mistrial, noting that there was overwhelming evidence, including Frazier's pretrial statements, that Frazier had committed an illegal homicide. As the People correctly note, the cases cited by the court (*People v. Hines* (1997) 15 Cal.4th 997, 1038; *People v. Wharton* (1991) 53 Cal.3d 522, 565; *People v.*

12

*Harris* (1994) 22 Cal.App.4th 1575, 1581) each specifically articulate that " '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " The trial court clearly understood that its responsibility was to grant a mistrial only if it found " 'prejudice that it judges incurable by admonition or instruction.' " (*People v. Wallace, supra*, 44 Cal.4th at p. 1068.) It did not. And the court here did more than merely admonish the jury to disregard the objectionable testimony. It affirmatively told the jury that Cruz's statements were "inaccurate," that it was not true that Frazier was ever suspected of any involvement in the 2007 shooting, that Frazier was eliminated "as a possible suspect," and that "[t]here is no evidence whatsoever that Mr. Frazier was involved in that homicide in any way or had any knowledge about it." The court emphasized that "[T]he bottom line here is that unrelated murder is unrelated [and] . . . has nothing to do with this event."

We also have some difficulty understanding Frazier's contention that the court's instruction was inadequate to cure any potential prejudice because the instruction still allowed the jury to infer that Frazier was the type of person who lived in a dangerous neighborhood where people fired guns and killed people—and that this was adverse character evidence. Frazier's defense was built on attempting to convey to the jury exactly that inference. Frazier's explanation to the jury of why he was carrying a gun at the time Tatmon was killed was that his best friend had recently been murdered and he felt he needed a gun to protect himself. Frazier testified that he fired the gun at Tatmon because of a "look" from Townsend that Frazier understood to mean that he was also required to participate and that Townsend might shoot him if he did not. Frazier said this was part of the "street code" that "I know from growing up in the neighborhoods I grew up in . . . ."

We disagree with Frazier's contention that evidence of the character of the neighborhood where he resided somehow constituted evidence of his bad character, and that the jury would understand it to be so. In any event, we reject Frazier's speculation

13

and instead "presume the jury followed the court's instructions." (*People v. Avila* (2006) 38 Cal.4th 491, 574.) We find no error.[7]

C.    *Frazier's Testimony*

At the outset of Frazier's direct examination, his counsel elicited testimony over Townsend's objection, that Frazier had been told by another inmate not to testify and his life was threatened if he did. Frazier said he had been assaulted on two occasions while in custody and that he was told by those assaulting him that it was because he "snitch[ed] on Little G." Townsend is also known as "Little G." Frazier further testified that following his arrest, a friend had told him that Townsend's father (known as "Big G") "wanted to get me a lawyer." Frazier said that Townsend had told him not to testify when both were being transported from court ("He told me not to get on the stand"), but Frazier specifically said that Townsend had not threatened him on that occasion or any other.

After extended discussion with counsel out of the presence of the jury, the court formulated limiting instructions on consideration of testimony, by Frazier and by other witnesses, concerning witness intimidation. Before concluding Frazier's direct testimony, the court advised the jurors that such evidence was to be considered for only the limited purpose of evaluating a witness's credibility and that "evidence related to witness intimidation cannot be used against a defendant unless you first find that the defendant either made the threats or authorized another to make the threat. [¶] . . . [¶] If you do not first find that a defendant authorized another to do this or did it themselves, you are limited to using this evidence to evaluate witness credibility."

---

[7] Frazier also argues prejudice from the delay between Cruz's testimony (on a Wednesday afternoon) and the admonition on the next court day (the following Monday). He acknowledges, however, that our Supreme Court, in *People v. Wharton, supra*, 53 Cal.3d 522 rejected the defendant's argument that a similar lapse of time would cause the jury to disregard the court's admonition, finding such the argument "mere speculation." (*Id.* at p. 566.) He suggests that *People v. Wharton* was wrongly decided and should be reconsidered. However, this court may not reconsider California Supreme Court authority. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

14

In this appeal, Townsend focuses on Frazier's testimony that Townsend's father reportedly wanted to obtain an attorney for Frazier, and in light of Frazier's other testimony and "the overall evidence relating to witness intimidation . . . the obvious inference was that Mr. Townsend was in league with his father in trying to muzzle Mr. Frazier as a witness" and that Townsend was "part of this witness intimidation." Townsend asserts that this was reversible error, contending that the evidence was irrelevant and unduly prejudicial. We disagree.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence includes evidence "relevant to the credibility of a witness." (Evid. Code, § 210.) " ' "Evidence a witness is afraid to testify is relevant to the credibility of that witness and is therefore admissible. [Citations.] Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible." ' [Citations.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 287–288; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368; see *People v. Guerra* (2006) 37 Cal.4th 1067, 1142 [evidence of third party threat, whether directly linked to the defendant or not, may bear on witness credibility].)

A trial court has discretion, within the limits of Evidence Code section 352, to permit introduction of evidence supporting a witness's credibility on direct examination. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1085.) We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*Ibid*.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

The trial court here carefully considered the prejudicial impact of the testimony, but found that it was "highly, highly probative . . . based on the facts of this case." The court further found such evidence was "relevant, material, and probative on the issue as

to why [Frazier] went and got Mr. Townsend to come back to the gym with him. It's relevant to the issue of why Mr. Frazier made the statements to the police that he did. Based on his testimony today, it's now been made relevant as to why he fired his gun in this event. It's relevant to five or six or seven other witnesses who have testified here. It has been made relevant in this record, and I think properly so. [¶] . . . And I think my record already reflects this—we've had active witness intimidation activity in this courtroom during this trial. From the time that this event was first presented to me in the informal description of the case by the attorneys when we were setting the schedule in a chambers conference, from that time forward, all three attorneys have always maintained that witness intimidation is an issue that is entwined with the facts of this case and cannot be separated, as best I can tell[.] [¶] . . . I do not perceive that I have a choice to exclude this evidence. I cannot do so without grossly distorting the record and the evidence in the case. I simply cannot exclude it from this case. The case came with this aspect. It's part of the case." The court overruled Townsend's objections, but immediately gave the limiting instructions, to which Townsend offered no objection, to the jury. The court even emphasized the importance of the limiting instructions, telling the jurors "I need full attention from everybody on this."

" ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 438.) The prejudice that Evidence Code section 352 " ' " 'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' " . . . [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' " (*People v. Doolin,* at pp. 438–439, citations omitted.)

We find no basis to conclude that the jurors adopted the inference Townsend suggests from the very limited testimony concerning Townsend's father in the face of the court's express instructions to contrary, and Frazier's testimony that he was never threatened by Townsend. We also fail to see how this speculative inference, even if adopted, would have greater prejudicial impact than Frazier's unobjectionable description of Townsend's unprovoked shooting of Tatmon, and his testimony that Townsend had asked him not to testify.

"The trial court correctly limited the evidence to 'the witness' state of mind, attitude, actions, bias, prejudice, lack or presence thereof,' and we presume the jury adhered to the trial court's limitations on this testimony. [Citations.]" (*People v. Olguin, supra,* 31 Cal.App.4th at p. 1368.) There was no abuse of discretion.

D.      *Cumulative Error*

Because we reject Townsend's individual claims of error, we likewise reject his contention that cumulative error requires reversal.

### III.      DISPOSITION

The judgments as to Frazier and Townsend are affirmed.


_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.