Filed 12/11/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037353 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 211268) |
| v. | |
| GENE SANCHEZ et al., | |
| Defendants and Appellants. | |

This appeal follows a months-long trial of four defendants on 13 counts, including conspiracy to commit murder, murder, and attempted murder. All of the charges were based on a series of shootings that allegedly were carried out in retaliation for the killing of a member of the El Hoyo Palmas gang by a member of a rival Sureño gang. The defendants--Gene Sanchez, Orlando Rojas, Michael Espana, and Samuel Castro--were convicted of all counts against them. The jury also found true all of the special allegations, which included gang allegations, firearm allegations, multiple-murder allegations, and a robbery special circumstance allegation.

On appeal, each defendant raises or joins in numerous claims of error, including violations of the constitutional right to confrontation, erroneous evidentiary rulings, insufficient evidence to support the guilty verdicts, and instructional error. They also assert cumulative prejudice rendering the trial unfair.

We affirm defendant Sanchez's judgment of conviction. We reverse defendant Rojas's judgment of conviction for resentencing. We affirm defendant Espana's judgment of conviction. We reverse defendant Castro's judgment of conviction with directions and for resentencing.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *El Hoyo Palmas and Affiliated Gangs*

Over defendants' objections, John Mendoza testified as an expert in the area of Nuestra Familia, Nuestra Raza, and Norteño criminal street gangs.  Mendoza, a former member of the Nuestra Raza and Nuestra Familia gangs, testified in exchange for a reduction in his sentence.  According to Mendoza, Norteños (or Northerners) are members of street gangs that identify with Northern California.  Nuestra Familia began as a prison gang and is at the top of the Norteño gang hierarchy.  Nuestra Raza, also a prison gang, is subordinate to Nuestra Familia.  Norteño street gangs, including El Hoyo Palmas (Palmas), fall under the Nuestra Familia umbrella.  In prison, all Northerners report to Nuestra Familia.  Mendoza testified that gang members gain respect by committing acts of violence, which they may brag about in custody.  Sureños, or Southerners, and Norteños are rivals.  Norteños refer to Sureños as "scraps," and "scrap hunting" refers to going out to attack or kill Sureños.

Evidence was presented that defendants were Palmas members.  For example, witnesses identified photographs in which defendants could be seen in front of Palmas graffiti, wearing clothing associated with the gang, or making gang signs.  Police searches also found clothing associated with Palmas in defendants' possession.  As discussed further below, San Jose Police Department Detective Anthony Kilmer testified over defendants' objection as an expert on Norteño street gangs and Palmas in particular.  He opined that all of the defendants were members of Palmas based on their tattoos, items found at their homes and on their computers, and/or police reports documenting their prior contact with law enforcement.  Defendants did not dispute their gang membership at trial.

In addition to Mendoza, three other former gang members testified as part of plea bargains.  Vince Tirri, a former Nuestra Raza member, testified as part of a plea deal that reduced his exposure from life to a range of seven to 19 years.  As discussed in detail

below, Tirri testified to several incriminating statements Espana made about the charged offenses while he and Tirri were in custody together. Tirri also testified to his impression that Sanchez, whom he met while neither was incarcerated, was a leader and influential member of Palmas who felt responsible for younger gang members.

Hector Delreal, a member of Palmas who was involved in some of the charged offenses, also testified as part of a plea deal. His testimony implicating the defendants is discussed below.

Joseph Abeyta, a former member of both Nuestra Raza and Palmas, testified to incriminating statements Espana made about the charged offenses while in custody. Specifically, he testified that Espana was being teased for being a virgin and another inmate and Norteño joked, "Yeah, . . . he's a virgin with hot ones under his belt," which Abeyta interpreted to mean Espana had committed murders. According to Abeyta, Espana did not deny the suggestion that he was a murderer. On cross-examination, Abeyta acknowledged that Espana could not have contradicted the inmate who made the "hot ones" comment due to their relative rank in the Norteño hierarchy. Espana objected to the admission of Abeyta's description of the conversation on hearsay grounds. The court ruled the testimony was admissible as an adoptive admission.

### B. *Firearms Evidence*

Police recovered three firearms, each of which was used in one or more of the charged offenses, which are described in detail below.

On March 1, 2007, police seized a .25-caliber pistol during a probation search of a residence. Delreal testified that another Palmas member left the gun in his car on February 28, 2007. As discussed below, that firearm was used in the shootings on Richmond Avenue (count 2), Hamilton Avenue (counts 3 & 4), and Waverly Avenue (counts 7 & 8).

On March 17, 2007, an officer investigating a loud party saw Castro, Espana, and a third man standing near a minivan. The officer seized a .357 revolver that he saw

3

underneath the front tire of the minivan. The gun did not belong to the owner of the residence and minivan. That firearm was used in the Hamilton Avenue shooting (counts 3 & 4).

Castro, Espana, and Rojas were arrested on March 30, 2007. After Rojas, who fled from police, was apprehended, an officer located a nine-millimeter Smith & Wesson pistol along the path Rojas had taken when he fled. That firearm was used in the shootings on Waverly Avenue (counts 7 & 8), San Tomas Aquino Parkway (counts 9 & 10), Poco Way (counts 11, 12, & 13), Virginia Avenue (count 14), and Giusti Drive (count 15).

### C. *Murder of Palmas Member Cesar Gonzalez*

Early on the morning of December 3, 2006, Cesar Gonzalez was shot and killed by, police suspect, a Sureño gang member. According to Detective Kilmer, Gonzalez was a member of Palmas. Delreal testified that there was an emergency meeting of Palmas members at defendant Sanchez's house on the evening of December 3, 2006. That meeting was attended by defendants Castro and Rojas, Pete Washington, possibly defendant Espana, and others. According to Delreal, Sanchez asked who was willing to "go do stuff," which Delreal interpreted to mean shoot Sureños in retaliation. Delreal testified that he, Castro, Rojas, and others volunteered. Following the meeting, Castro and Delreal met at a gas station where Castro told Delreal to go to the east side of San Jose and said he would go to the west side.

### D. *December 3, 2006 Shootings*

#### 1. *McCreery Avenue Shooting*

Delreal testified that on the evening of December 3, 2006, following the meeting at Sanchez's house and his discussion with Castro, he and two other Palmas members went to McCreery Avenue on the east side of San Jose looking for Sureños. They shot at a group of men, hitting Jesus Ayala, a Sureño gang member.

4

## 2. *Richmond Avenue Shooting*

Meanwhile, according to Delreal, Castro went to the west side of San Jose in his Toyota Tacoma truck. Castro drove a green Toyota extra cab pickup that, according to an officer who conducted surveillance on Castro, looked darker and more blue in color in certain light.

Ivan Sandoval, a Sureño gang member, was shot outside an apartment complex on Richmond Avenue on the evening of December 3, 2006. Sandoval testified that the shooter was in a black or grayish truck. One of the individuals in the truck, who Sandoval identified as Washington, asked Sandoval if he was a Sureño by saying, "Sureño rifa; right?" Sandoval responded that he was and Washington began shooting. Sandoval testified that he knew Washington from juvenile hall.

Witness Shareen Nassarllah testified that the shooter was in the passenger seat of a passing truck. The shooter asked Sandoval, "Sur trece, que no?" Sandoval answered, "Yeah," indicating he was a Sureño, and was shot. Venancio Escobar, who also was shot in the incident, testified that the shots came from a dark green pickup truck. Another witness, Tony Guillen, testified that the shooter was in a greenish four-door truck. The officer who responded to the shooting testified that, on his way to the scene, he passed a dark green Toyota pickup truck.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene of the Richmond shooting and determined that they were fired by the .25-caliber pistol recovered by police on March 1, 2007. Delreal testified that he had seen Castro with that gun a couple of months before it was left in his vehicle in February 2007.

Castro was charged with attempted murder (Pen. Code, §§ 187, 664, subd. (a), count 2)[1] of Sandoval.

---

[1] Further unspecified statutory references are to the Penal Code.

5

### E. *December 14, 2006 Hamilton Avenue Shooting*

Juan Perez testified that he and several other men were outside his Hamilton Avenue home at about 9:30 p.m. on December 14, 2006, when two people with hoods over their heads approached and asked if the men were Sureños. Perez answered that they were not and the hooded men then shot, killing Luis Medina and injuring Juan Payan. On April 12, 2007, Perez picked Washington out of a photo lineup as one of the shooters.

Fernando Reyes, who lived near the scene of the shooting, testified that after hearing gunshots he saw three men run away from Hamilton and get in a light blue pickup truck, which he believed to be a Nissan king cab. Reyes testified that a picture of Castro's truck looked "more or less similar to the one" he saw, but he noted differences in the wheel rims and windows.

Delreal testified that while he and Castro were cellmates in jail, Castro admitted that he was present at the Hamilton Avenue shooting and "just . . . drove." Delreal testified that Rojas also discussed a shooting on Hamilton while in custody. According to Delreal, Rojas said that he approached a group of Sureños and shot at them with a nine-millimeter pistol and that two people were shot, one of whom died.

Jeremy Rosario, Washington's roommate and close friend, testified that Washington--who died on February 27, 2007--was a member of Palmas. Rosario testified that Washington said he was involved in a shooting near Hamilton and that Castro was there as well.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene of the Hamilton Avenue shooting and determined that they were fired by the .25-caliber pistol recovered by police on March 1, 2007 and the .357-revolver recovered by police on March 17, 2007.

6

Castro was charged with the murder of Medina (§ 187, count 3) and attempted murder of Payan (§§ 187, 664, subd. (a), count 4).[2]

### F.    *January 20, 2007 Waverly Avenue Party Shooting*

There was a party on Waverly Avenue, which is in a Norteño neighborhood, on January 20, 2007. Both Sureños and Norteños attended the party. A fight ensued. Shots were fired from the front of the house and Jose Romero and Marcos Lomeli, a Sureño gang member, were wounded.

Manuel Amaya, a Sureño, testified that he arrived at the party with other Sureños. Because he was dressed like a Sureño, a number of Norteños standing in the front yard called him a scrap. Some individuals said "Norte Palmas" and told Amaya and his friends to leave, but they did not. Later, someone asked Amaya if he was a scrap. He answered he was a Sureño and the man hit him in the face with a beer bottle. Amaya identified a member of Palmas as the man who hit him. Shortly thereafter, the lights went out and there was shooting. Amaya did not recognize any of the defendants as having attended the party.

Jose Cervantes, another Sureño who attended the Waverly party, testified that he heard people at the party yelling "Norte" and "Palmas."

Partygoer Janet Ayala was interviewed by police in April 2007. At that time, Ayala picked Sanchez, Espana, and Castro out of photo lineups and indicated they were at the Waverly Avenue party. She also told the officer that she thought Castro had said "Why is there a scrap party being thrown in my hood?" On cross-examination, Ayala said she never personally heard anyone say "Why is there a scrap party being thrown in my hood," but heard from others that someone said that. She also indicated that she was never positive that the men she identified were at the party, but only thought they looked

---

[2] Espana also was charged in counts 3 and 4, but the People dismissed those counts as to him during the trial.

at little bit like people she saw there.

In April 2007, another partygoer, Sergio Crisostomo, identified Castro in a photographic lineup as having been at the party.

Yesenia Ramirez, who also attended the Waverly party, testified that the gunshots came from a vehicle, but said she could not describe it. On the night of the shooting, however, she told police that the shots were coming from two vehicles, one of which she described as a dark blue or dark green pickup truck.

Delreal testified that Rojas told him that he, Espana, and Castro were at the party on Waverly Avenue. Rojas told Delreal that, upon seeing Sureños, they left to get their guns and came back and shot into the party. Rojas admitted to Delreal that he was one of the shooters. Delreal further testified that he lived just down the street from the location of the Waverly shooting. On the night of the shooting, Castro called Delreal and said "some stuff happened by your house." Shortly thereafter, Castro, Espana, Rojas, and another Palmas member arrived at Delreal's house and dropped off some hats with the letter "P" on them, which are associated with the Palmas gang.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene of the Waverly shooting and determined that they had been fired by the nine-millimeter Smith & Wesson pistol recovered by police on March 30, 2007 and the .25-caliber pistol recovered by police on March 1, 2007.

Castro was charged with the attempted murder of Lomeli and Romero (§§ 187, 664, subd. (a), counts 7 & 8).

### G. *January 27, 2007 San Tomas Aquino Parkway Shooting*

Josafat Hernandez testified that on the night of January 27, 2007, he met two friends outside his apartment on San Tomas Aquino Parkway. One of the friends, Rigoberto Gonzalez (Rigoberto), got out of the car so that Hernandez could get into the backseat. Two men approached Rigoberto while he was standing outside the car and asked in Spanish what neighborhood he belonged to. Rigoberto answered: "I do not

8

belong to a neighborhood" and was shot to death. Hernandez was shot in the leg. Hernandez testified that he recognized Espana "a little bit."

Alfonso Flores, who lived on San Tomas Aquino Parkway at the time of the shooting, testified that on January 27, 2007, he heard what sounded like firecrackers and screeching tires. He looked out the window and saw a dark-colored, extended-cab truck with its lights off backing up. When shown a picture of Castro's truck at trial, Flores said it looked like the truck he saw the night of the shooting.

Delreal testified that Rojas told him that he, Espana, and Washington were involved in a shooting near San Tomas Aquino Parkway. Rojas told Delreal that Washington approached an individual who was getting out of a car, asked if he was a Sureño, and then shot the individual. Rojas shot the man after he was on the ground and Espana drove them away in Castro's truck. Castro was not there because he was with his girlfriend.

Jeremy Rosario testified that Washington said he shot someone at San Tomas Aquino Parkway and that Espana was present.

The first 911 phone call regarding a shooting occurred at 11:11 p.m. Cell phone records indicated that, around that time, Rojas's cell phone connected to a cell tower within a mile of the shooting, and then moved to the east side of San Jose. Rojas lived on the south side of the city, which is not in the vicinity of the shooting. Cell phone records further showed that, at about 10 minutes prior to the shooting, Espana's cell phone connected to a cell tower within two miles of the crime. At 11:18 p.m.--seven minutes after the first 911 call--Espana's phone connected to a cell tower nine miles from the crime scene towards east San Jose.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed nine-millimeter casings found at the scene of the San Tomas Aquino Parkway shooting and determined that they were fired by the nine-millimeter Smith & Wesson pistol police recovered on March 30, 2007.

9

Rigoberto's mother testified that Rigoberto and his half brother Gustavo were fighting over property before Rigoberto was killed. She testified that she believed Gustavo had killed Rigoberto. Gustavo testified that he was not involved in Rigoberto's death, but acknowledged the two had been fighting.

Castro, Espana, and Rojas were charged with the murder of Rigoberto (§ 187, count 9) and attempted murder of Hernandez (§§ 187, 664, subd. (a), count 10).

### H. February 5, 2007 Poco Way Shooting

On the afternoon of February 5, 2007, Alberto Jose Avalos, Arturo Amezquita, and Victor Castaneda were fired on by two men while parked in a white Jetta on Poco Way. At trial, Amezquita identified Rojas as one of the shooters and testified that he recognized Rojas because the two sat next to each other during a school placement exam prior to the shooting. An adult education placement program registrar testified that both Amezquita and Rojas were registered for a placement test that was conducted on January 9, 2007. Avalos and Amezquita testified that they had seen the shooters earlier that day while they were driving around. Avalos said the men had thrown Norteño gang signs at that time and that he had thrown a Sureño gang sign.

Delreal testified that he was involved in the Poco Way shooting. He was driving with Rojas and another Palmas member when Rojas saw some Sureños he had "gotten into it with" in a white Jetta. When the Jetta turned onto Poco Way, Delreal dropped Rojas and the other Palmas member off. He saw them shoot into the Jetta.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed four casings found at the scene and determined that two were fired by the nine-millimeter Smith & Wesson pistol police recovered on March 30, 2007.

Rojas was charged with attempted murder of Alberto Jose Avalos, Arturo Amezquita, and Victor Castaneda (§§ 187, 664, subd. (a), counts 11, 12 & 13).

10

### I. *Pete Washington's February 27, 2007 Death*

On February 27, 2007, Pete Washington was found dead from a gunshot wound to his right temple in the room he shared in a transitional home with Jeremy Rosario.

Another resident of the transitional home, Johnathan Ashley, testified that Rosario arrived home on the evening of February 27, 2007 and he went into the room he shared with Washington. Rosario became upset when he realized something was wrong with Washington. Ashley went into the room and saw Washington lying on his bed with a gun near him and blood on his pillow. Ashley said he told Rosario to move the gun.

The officer who interviewed Rosario the night of Washington's death testified that Rosario was upset and crying. Rosario told the officer he had taken the gun out of Washington's left hand and put in on top of the refrigerator. Rosario testified that he used a jacket to move the gun to avoid getting his prints on it. The gun was found in the pocket of a jacket on top of the refrigerator. Three latent fingerprints were found on the gun, all of which matched Rosario and none of which matched Washington.

Detective Sean Pritchard, who was investigating the Hamilton Avenue and San Tomas Aquino Parkway shootings, interviewed Rosario on March 20, 2007. Based in part on Rosario's statements, Detective Pritchard began surveillance of Sanchez and Castro.

### J. *March 28, 2007 Virginia Avenue Shooting*

A San Jose police officer testified that he responded to the scene of a shooting on Virginia Avenue at 7:52 p.m. on March 28, 2007. The officer found 15-year-old Edgar Martinez lying in the gutter with at least six gunshot wounds. Martinez, a Sureño, died. Officers found 10 shell casings at the scene.

Virginia Avenue resident Tom Quiroz testified that he heard gunshots on March 28, 2007. He looked out the front door and saw four men running. Three of the men jumped into a silver Dodge Stratus and sped away.

Castro's brother, Gilbert, drove a silver Dodge Stratus.

11

On March 31, 2007, Castro spoke with his other brother, Juan, at the police station and--in a conversation recorded by police--said he had driven the Stratus "the night the Virginia thing happened."

Delreal testified that, while he and Rojas were cellmates, Rojas discussed his involvement in the Virginia Avenue shooting. Rojas told Delreal that he, Castro, Espana, and another individual were out in Castro's brother's car. Rojas approached an individual and said he was from Palmas. The individual ran away and Rojas chased him and "unloaded the clip on him."

Tirri testified that, while in custody, Espana discussed being involved in a shooting outside an apartment building or house shortly before he was arrested on March 30, 2007. According to Tirri, Espana said that Castro was driving his brother's car, which Tirri said was "a Stratus, or some type of car like that."

San Jose Police Officer Jaime Jimenez was conducting surveillance on Castro at the time of the Virginia Avenue shooting. He testified that at the time of that shooting Castro's truck was parked at his residence but that the Dodge Stratus associated with that residence was not there.

A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene and determined that they were fired by the nine-millimeter Smith & Wesson pistol police recovered on March 30, 2007.

Castro, Espana, and Rojas were charged with the murder of Edgar Martinez (§ 187, count 14).

### K.    *March 30, 2007 Giusti Drive Shooting*

San Jose Police Officer James Hussey testified that he was surveilling Castro on the evening of March 30, 2007. According to Officer Hussey's testimony, shortly after 7:00 p.m. that evening, Castro and Rojas left Castro's home in the Toyota pickup truck and drove to pick up Espana. Two hours later, the truck parked in a parking lot near Snow and Giusti Drive and two individuals with hoods pulled up on their heads and

12

exited the vehicle. They approached a man in blue mechanic's pants and an orange shirt who was working on a car. Officer Hussey testified that the three men appeared to be having a conversation and he thought he might be witnessing a drug deal. After about 30 seconds, he saw one of the hooded men point something at the mechanic and heard eight to 10 gunshots. The two men then ran to Castro's truck.

Multiple patrol cars surrounded the vehicle shortly after it pulled away. Castro remained in the vehicle and was arrested. Rojas and Espana got out of the vehicle and ran, but were apprehended a short distance away. A nine-millimeter Smith & Wesson pistol was found along the path Rojas took when he fled police. A criminalist from the Santa Clara County Crime Laboratory testified that he analyzed casings found at the scene and determined that they were all fired from that gun.

Espana was handcuffed, searched, and made to sit on the pavement. After Espana had been moved to another location, an officer found the victim's wallet on the ground where Espana had been seated.

The victim, locksmith Hernan Koba, died of his wounds. A cell phone was found hanging around his neck. An expert in the area of forensic toxicology testified that there was methamphetamine in Koba's body at the time of his death in an amount suggesting he had been using the drug chronically.

Delreal testified that Rojas discussed the Giusti Drive shooting with him while they were cellmates. Rojas said that he, Castro, and Espana were out and that he and Espana approached Koba with the intent to rob him. According to Delreal, Rojas said Koba gave them his wallet but refused to give them the cell phone that was hanging around his neck, so Rojas shot him. Rojas admitted to Delreal that he ran from police and threw his gun while he was running.

Tirri testified that Espana said he shot Koba and that he approached him on the mistaken belief that he was a Sureño. Tirri informed Espana that he would not get "credit" for the killing because Koba was not a Sureño. Espana responded that he and his

13

boys had already "dropped some bodies."

Castro's brother, Juan, testified that Castro told him he thought they were going to a party the night of the Giusti Drive shooting. Castro said he was parking when Rojas and Espana came running back to the car. They told him Rojas shot the victim because he refused to give them his wallet.

Rojas testified that the Giusti Drive shooting was the result of a drug deal gone bad. According to Rojas, Castro recognized Koba and wanted to buy drugs from him, so Rojas and Espana approached Koba to make a transaction. A fight over money ensued and Espana shot Koba, who looked like he was about to hit Espana. Back in Castro's truck, Rojas learned Espana had taken Koba's wallet and agreed to take the gun and clip from Espana to hide.

Castro, Espana, and Rojas were charged with the murder of Koba (§ 187, count 15).

### L. *Detective Kilmer's Expert Testimony*

As noted above, Detective Kilmer testified as an expert on Norteños and Palmas. Detective Kilmer opined that all of the following were carried out for the benefit of, at the direction of, and/or in association with the Palmas criminal street gang: (1) the December 3, 2006 Richmond Avenue shooting; (2) the December 14, 2006 Hamilton Avenue shooting; (3) the January 20, 2007 Waverly Avenue shootings; (4) the January 27, 2007 San Tomas Aquino Parkway shooting; (5) the February 5, 2007 Poco Way shooting; (6) the March 28, 2007 Virginia Avenue shooting; and (7) the March 30, 2007 Giusti Drive shooting and robbery. Detective Kilmer based that opinion on evidence that some of the victims were Sureños, that certain of the shootings occurred in known Sureño neighborhoods, and that such shootings generally convey a message that the gang is strong. Detective Kilmer's opinions were based, in part, on his review of police reports as well as conversations with other officers, gang intervention counselors, witnesses, and gang members.

14

Before trial, defendants moved in limine to exclude Detective Kilmer's testimony on the grounds that (1) the defense did not know the basis of some of his testimony and (2) portions of his testimony were based on out-of-court testimonial statements by witnesses (e.g., other police officers and gang members) who were neither present at trial, nor subject to cross-examination, in violation of their Sixth Amendment confrontation clause rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). The court rejected those arguments and denied defendants' motions in limine to exclude Detective Kilmer's testimony.

### M.   *Rosario's Additional Testimony and Cross-examination*

In addition to his accounts of the Hamilton Avenue and San Tomas Aquino Parkway shootings, Jeremy Rosario testified more generally that Washington was a member of Palmas and was friends with of all of the defendants, who also belonged to the gang. While Rosario was not a member of the gang, he considered Washington to be his best friend and he spent time with Washington and the defendants. Rosario testified that he had seen all of the defendants with guns and had overheard them discuss "scrap hunting." According to Rosario, Sanchez seemed to be the one encouraging or suggesting scrap hunting. Washington told Rosario that he sold cocaine and gave the money he earned doing so to Sanchez for gang expenses. Rosario testified about a specific incident in which he saw Sanchez ask a 15- or 16-year-old boy whether he was "down with their hood," and then gave the boy a gun and tell him to "blast" some Sureño gang members in a nearby park.

Near the beginning of his cross-examination, Espana's counsel asked Rosario if he had been truthful with the police during their investigation of Washington's death. Rosario responded with "What does this have to do with me finding my best friend dead and these fuckin' murderers?" Rosario further told Espana's attorney "You fuckin' disgust me. You are going to go home and sleep beautifully . . . and I have to remember." The jury was excused from the courtroom and the trial court ordered the

comments stricken on its own motion.  Counsel for defendants objected to that ruling, arguing that Rosario's outburst was relevant to his credibility, bias, and attitude.  The court nevertheless ordered the comments stricken as nonresponsive.

When cross-examination continued, Rosario provided some substantive responses but frequently answered questions "I don't remember," refusing to review any documents in an effort to refresh his memory.  He also answered "sure" to many of the questions posed by the defense attorneys.  Eventually, he explained that "sure" "sometimes" meant yes and "sometimes" meant no; it also meant "if that's what you wanna think."  The defense attorneys were permitted to impeach Rosario with his prior statements to police and his grand jury testimony.  Among other things, defense counsel questioned Rosario about statements he made to police about associating with a Sureño-affiliated gang in Santa Maria in 2008.

Outside the presence of the jury, counsel for defendants requested that Rosario's direct examination testimony be stricken of two grounds.  First, they argued Rosario was an incompetent witness under Evidence Code section 701, subdivision (a)(1) because he lacked the ability to communicate in a meaningful manner.  Second, they urged his conduct denied defendants the right to a fair trial and to confront a witness against them.  The court refused to strike Rosario's testimony, reasoning that while Rosario was not "giving meaningful answers," he "did answer the questions" and he "was subjected to . . . unlimited cross-examination."

### N.    *Indictment*

On May 13, 2008, the grand jury returned a 17-count indictment against the four appellants and seven other codefendants.  The charges against the seven other codefendants were dismissed or severed.[3]  The indictment charged Sanchez, Castro, Espana, and Rojas with conspiracy to commit murder (count 1; § 182, subd. (a)(1)).  It

---

[3] These included counts 5, 6, 16, and 17, which accordingly are not at issue here.

further charged Rojas of three counts of murder (counts 9, 14, 15), and four counts of attempted murder (counts 10-13); it charged Espana with four counts of murder (counts 3, 9, 14, 15) and two counts of attempted murder (counts 4, 10); and it charged Castro with four counts of murder (§ 187; counts 3, 9, 14-15) and five counts of attempted murder (§§ 187, 664, subd. (a); counts 2, 4, 7, 8, 10).[4] Each count included the gang enhancement allegation that defendants committed the charged crime for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members, within the meaning of section 186.22, subdivision (b)(1)(C). Multiple murder and gang special circumstance allegations were also charged in connection with the murder charges (§ 190.2, subd. (a)(3), (a)(22)), and many of the charges included firearm allegations (§ 12022.53, subds. (b), (c), (d), (e)(1)). In connection with the murder of Hernan Koba charged in count 15, the indictment included a robbery special circumstance allegation (§ 190.2, subd. (a)(17)).

### O.    Guilty Verdicts and Sentencing

The jury deliberated for more than seven days before returning verdicts of guilty on all counts and finding all allegations and enhancements to be true.

The trial court sentenced Sanchez to 50 years to life consecutive to five years. Rojas was sentenced to life without the possibility of parole, consecutive to life with the possibility of parole, consecutive to 175 years to life. Espana received a sentence of life without the possibility of parole, consecutive to life with the possibility of parole, consecutive to 100 years to life. The court sentenced Castro to life without the possibility of parole, consecutive to life with the possibility of parole, consecutive to 225 years to life.

All four defendants timely appealed.

---

[4] Counts 3 and 4 later were dismissed as to Espana.

17

## II. DISCUSSION

### A. *Jeremy Rosario's Testimony*

All defendants raise two arguments on appeal related to Rosario's testimony. First, they maintain the trial court erred by denying their request to strike Rosario's testimony in full due to his recalcitrance on cross-examination. For that argument, defendants rely on their constitutional right to confront the witnesses against them as well as the Evidence Code. Second, they urge that it was error to strike only Rosario's outburst referring to defendants as murderers. We consider each contention in turn.

#### 1. Confrontation Clause

The state and federal Constitutions guarantee a criminal defendant the right to confront the witnesses against him. (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15.) The primary purpose of confrontation is to secure the opportunity for cross-examination. (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137; *United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*).) Defendants maintain Rosario's refrain of "I don't remember" and "sure" denied them their constitutionally guaranteed opportunity to cross-examine him. They maintain the trial court erred by failing to strike Rosario's direct testimony in its entirety. The People respond that Rosario's presence on the witness stand afforded defendants an adequate opportunity for cross-examination.

A witness who "refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness." (*People v. Rios* (1985) 163 Cal.App.3d 852, 864; see also *Douglas v. Alabama* (1965) 380 U.S. 415, 422 [confrontation clause violation where witness refuses to testify at all on privilege grounds].) By contrast, a witness who suffers from memory loss--real or feigned--is considered "subject to cross-examination" because his presence and responses provide the "jury with the opportunity to see [his] demeanor and assess [his] credibility." (*People v. Gunder* (2007) 151 Cal.App.4th 412, 420 (*Gunder*) ["The circumstance of feigned memory loss is not

18

parallel to an entire refusal to testify."]; see also *Owens*, *supra*, 484 U.S. at p. 559 [opportunity to cross-examine not denied where witness suffers from memory loss].)

At issue here is whether Rosario is more akin to a witness who refuses to answer questions or one who feigns memory loss. We conclude that, despite Rosario's selective memory and evasiveness, the confrontation clause was satisfied because " '[his] presence at trial as a testifying witness gave the jury the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony.' " (*People v. Homick* (2012) 55 Cal.4th 816, 861 (*Homick*), quoting *People v. Perez* (2000) 82 Cal.App.4th 760, 766.) We are not persuaded by defendants' contention that *Homick*, *Perez*, and *Gunder*, where the witnesses were equally forgetful on direct and cross-examination, do not apply because Rosario's memory loss did not manifest itself until cross-examination.[5] The extent of a witness's memory loss does not impact the rationale underlying those decisions--namely, that the confrontation clause is not violated where the jury has the opportunity to observe the witness's demeanor and to assess his credibility. Indeed, if anything, the selective nature of Rosario's claimed memory loss reflected poorly on his credibility, thus benefiting defendants.[6]

---

[5] In fairness, Rosario was a reluctant and forgetful witness throughout his testimony. However, he permitted the prosecutor to refresh his recollection, while denying defense counsel that opportunity.

[6] *People v. Murillo* (2014) 231 Cal.App.4th 448 is not contrary. There, " '[t]he trial court allow[ed] the prosecutor to ask [a prosecution] witness more than 100 leading questions concerning the witness's out-of-court statements to prove defendant guilty of several criminal offenses.' " (*Id*. at pp. 449-450.) For example, the prosecutor asked the witness: " 'Isn't it true . . . that you were shown six photographs [in January] and asked whether you could identify anybody in those photographs?; [D]o you recall telling the detectives that it looks like, but you're not sure, [it is] number four [(Murillo)]?; [D]o you recall circling number four [(Murillo)] and putting your initials, the date, and the time on that document?; [D]o you recall writing a statement that says, "Number four [(Murillo)] looks like him, but not completely sure. Kind of the same face structure"?; [O]n page one of this exhibit, do you recall signing it under signature of witness in front of the detectives?' " (*Id*. at p. 451.) The witness refused to answer or said he had nothing to
(continued)

19

In addition to claiming memory loss, Rosario frequently responded with an equivocal "sure." Rosario's behavior was, in this regard, similar to that of the witness in *Homick* who "refused to answer questions . . . and generally behaved in an uncooperative and childish manner." (*Homick*, *supra*, 55 Cal.4th at p. 855.) We see no practical difference between a witness who feigns lack of memory to avoid answering a question and one who provides a meaningless response like Rosario's admittedly hollow "sure." In both cases, while the witness's response " 'narrow[s] the practical scope of cross-examination,' " there is no confrontation right violation because the jury has " 'the opportunity to assess [his] demeanor and whether any credibility should be given to [his] testimony.' " (*Id*. at p. 861.)

## 2. *Evidence Code Section 701*

Defendants Rojas and Espana argue that, alternatively, the court erred by failing to strike Rosario's testimony pursuant to Evidence Code section 701, subdivision (a)(1) and (a)(2). Evidence Code section 701, subdivision (a)(1) provides that a person is disqualified to be a witness if he or she is "[i]ncapable of expressing himself or herself concerning the matter so as to be understood." Evidence Code section 701, subdivision (a)(2) provides that a person is disqualified to be a witness if he or she is "[i]ncapable of understanding the duty of a witness to tell the truth." While Rojas and Espana fail to develop this argument thoroughly, their theory appears to be that Rosario's incessant use of the response "sure," even after the trial court ordered him to answer questions,

---

say. Our colleagues in the Second District concluded that the prosecutor's "questions create[d] the illusion of testimony[, which] deprived defendant of a fair trial because he could not exercise his constitutional right of cross-examination." (*Id*. at p. 450.) The court reversed, citing *Crawford*. (*Id*. at p. 455.) As noted, case law distinguishes between witnesses who feign memory loss and those who refuse to answer questions. Rosario fell into the former category, while the witness in *Murillo* fell into the later. And in *Murillo* the prosecutor essentially testified for the witness. That did not occur here; Rosario provided substantive responses and testimony.

20

demonstrates he was an incompetent witness.

"The party challenging a witness bears the burden of proving a reason for disqualification, and a trial court's determination will be upheld in the absence of a clear abuse of discretion." (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1071.) We find no abuse of discretion as the record contains no evidence that Rosario was incapable of communicating so as to be understood or of understanding his duty to tell the truth. To the extent defendants contend Rosario was deliberately evasive or untruthful, those are questions of credibility to be resolved by the jury as trier of fact. (*People v. Lewis* (2001) 26 Cal.4th 334, 361.)

### 3. *Evidence Code Sections 711 and 773*

Defendants also maintain the trial court abused its discretion by failing to strike Rosario's testimony pursuant to Evidence Code sections 711 and 773. Evidence Code section 711 provides that all witnesses must be subject to cross-examination, while Evidence Code section 773 governs the scope of such cross-examination. The People maintain defendants waived this claim by failing to object on the basis of Evidence Code sections 711 and 773 below. Defendants concede they did not cite those particular provisions, but contend they nevertheless preserved the issue for appeal. Alternatively, they urge trial counsel rendered constitutionally ineffective assistance in failing to raise Evidence Code sections 711 and 773.

Regardless of whether defendants sufficiently preserved the argument, it is meritless. In the cases on which defendants rely, the witnesses refused to testify on cross-examination on privilege grounds. (*People v. Daggett* (1990) 225 Cal.App.3d 751 [witness invoked Fifth Amendment right against self-incrimination]; *People v. Seminoff* (2008) 159 Cal.App.4th 518 [same]; *Fost v. Superior Court* (2000) 80 Cal.App.4th 724 [witness invoked newspersons' shield law].) As discussed above in the context of the confrontation clause, courts have drawn a distinction between witnesses who rely on privilege to avoid testifying and those with real or feigned memory loss. The former are

21

deemed to have prevented cross-examination; the latter are not. Because Rosario did not invoke any privilege, but submitted to cross-examination, the trial court did not abuse its discretion in refusing to strike Rosario's testimony.

### 4. Rosario's Outburst

While the court refused to strike Rosario's testimony in full, it did strike as nonresponsive the outburst in which he called defendants "murderers." The court did so on its own motion over defendants' objections.

Defendants maintain the court lacked the authority to strike Rosario's statement on its own motion. For that argument they cite Evidence Code section 766, which states: "A witness must give responsive answers to questions, and answers that are not responsive shall be stricken on motion of *any party*." (Italics added.) As the People note, there is authority holding that courts are not required to "await the motion of [a party] to have the irresponsive answers stricken out . . . [because] the responsibility of . . . conducting the trial rests ultimately upon the judge." (*People v. Dad* (1921) 51 Cal.App. 182, 185-186.) However, it is also the case that a nonresponsive answer may be admissible if "it furnishes relevant facts." (*Holzer v. Read* (1932) 216 Cal. 119, 122 (*Holzer*); see also *Westman v. Clifton's Brookdale, Inc.* (1948) 89 Cal.App.2d 307, 314.) And, where a nonresponsive answer is otherwise admissible, "an objection that an answer is not responsive can be made only by the party who asks the question." (*People v. Dykes* (1930) 107 Cal.App. 107, 116; *Holzer*, *supra*, at pp. 122-123 ["If the answer is in itself proper evidence, the party who is examining the witness has the right to take and retain it if he chooses to do so."].)

In view of the foregoing, the propriety of the court's decision to strike Rosario's outburst on its own motion turns on whether his statement was admissible. Defendants contend Rosario's outburst was admissible because it bore on his credibility in two ways: (1) it revealed Rosario's hatred for defendants, thereby establishing he had a motive to lie about their conduct; and (2) it cast doubt on his testimony that he was best friends with

22

Washington, given Washington's friendship with defendants and the fact that (according to Rosario) Washington was himself a murderer. As to the second point, defendants argue that Rosario's hatred for "murderers" suggests that, in reality, he disliked Washington, which in turn supports one theory they advanced at trial--namely, that Rosario killed Washington.

We disagree with defendants' characterization of Rosario's outburst as suggesting Rosario hated people he believed to be murderers, including defendants. Instead, the outburst evinced Rosario's bitterness about being required to testify and his belief defendants were murderers. In that regard, the excluded outburst was cumulative of other evidence. Rosario's aversion to testifying not only was evident in his demeanor, but the prosecutor elicited testimony from him that he was testifying reluctantly pursuant to a subpoena and had burned copies of transcripts she had asked him to review in advance of trial. And, as defendants acknowledge, "Rosario had already testified that . . . the . . . defendants[] had been involved in murders." Accordingly, any error in striking Rosario's outburst was harmless "because the excluded evidence was merely cumulative of properly admitted evidence." (*People v. Helton* (1984) 162 Cal.App.3d 1141, 1146.) We cannot say it is reasonably probable that defendants would not have been convicted had the jury been permitted to consider the excluded testimony and cross-examination related to it, as the outburst simply reinforced other evidence. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### B. *John Mendoza's Expert Testimony Regarding Prison Gangs*

Defendants Rojas, Sanchez, and Espana maintain the trial court abused its discretion by failing to exclude gang expert John Mendoza's testimony as irrelevant or as substantially more prejudicial than probative under Evidence Code section 352. We disagree.

23

### 1.    Standard of Review

"On appeal, we apply an abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1140; see *People v. Carter* (2003) 30 Cal.4th 1166, 1194 [admission of gang evidence reviewed for abuse of discretion].)  "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason." ' " (*People v. Waidla* (2000) 22 Cal.4th 690, 714.)  If the erroneous admission "implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225, fn. 7.)

### 2.    Relevance

Only relevant evidence is admissible.  (Evid. Code, § 350.)  " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.)

Here, Mendoza's testimony was relevant to the credibility of witnesses Delreal, Tirri, and Abeyta, all of whom testified that certain of the defendants had admitted criminal activity, including participation in the charged offenses, while in custody.  Jurors might be incredulous that accused murderers would admit their crimes to other inmates, some of whom they did not know outside of jail.  Mendoza's testimony that Palmas members must report to members of Nuestra Raza and the Nuestra Familia in jail, as well as that gang members may brag about acts of violence to gain respect, explained why defendants might have made such admissions.  Moreover, Mendoza's testimony describing the history of the Norteño/Sureño rivalry and its origins in the California prison gangs was relevant to motive.  In particular, it served to elucidate the prosecution's theory that the charged offenses were motivated by a rivalry between Norteños and Sureños and to furnish the jury a context for understanding why defendants might commit numerous unprovoked shootings.  That testimony also bore on the gang

24

allegations alleged in connection with the offenses. For these reasons, Mendoza's testimony was admissible under Evidence Code sections 210 and 350. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168 [gang evidence is "relevant on the issue of a witness's credibility"]; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 [evidence of gang affiliation and activity admissible where relevant to motive]; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1050-1051 [gang evidence admissible where relevant to gang enhancement].)

### 3. *Evidence Code Section 352*

Defendants argue that even if Mendoza's testimony about prison gangs was relevant, its probative value was outweighed by its prejudicial effect, necessitating its exclusion. Evidence Code section 352 gives the trial court the discretion to exclude evidence that is otherwise admissible if the court determines that the probative value of the evidence is "substantially outweighed" by the probability that its admission will "create substantial danger of undue prejudice." Courts have recognized that gang-related evidence can be inflammatory. (*People v. Williams* (1997) 16 Cal.4th 153, 193.) The trial court's ruling on an Evidence Code section 352 objection " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Defendants have not made that showing here.

As noted, Mendoza's testimony explained why defendants may have committed the shootings and then discussed their guilt with fellow inmates. Given the relevance of Mendoza's testimony to various key issues--including witness credibility, motive, and the gang enhancement--we cannot say the trial court acted arbitrarily, capriciously, or in an absurd manner in concluding that the prejudicial effect of Mendoza's testimony did not substantially outweigh its probative value.

25

## C.  *Detective Kilmer's Testimony*

In *Crawford*, the Supreme Court announced a new rule:  the confrontation clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.)  At trial, Detective Kilmer testified that his expert opinions were based, in part, on out-of-court statements, including police reports and conversations with gang members and other officers.  Defendants argue those out-of-court statements--so-called "basis evidence"--were both testimonial and were offered for their truth, such that Detective Kilmer's testimony ran afoul of *Crawford*.

Expert basis evidence implicates the confrontation clause only where the expert discloses or otherwise conveys to the jury the *substance* of testimonial out-of-court statements.  (*U.S. v. Johnson* (4th Cir. 2009) 587 F.3d 625, 635 (*Johnson*) ["An expert witness's reliance on evidence that *Crawford* would bar if offered directly only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation."]; *U.S. v. Lombardozzi* (2nd Cir. 2007) 491 F.3d 61, 72 [same]; *U.S. v. Gomez* (9th Cir. 2013) 725 F.3d 1121, 1129 [same].)  In the Supreme Court's fractured decision in *Williams v. Illinois* (2012) __ U.S. __ [2012 U.S. Lexis 4658] [132 S.Ct. 2221], all nine justices agreed that it is the admission of the *contents* of out-of-court statements that raises potential confrontation clause concerns.  (*Id.* at p. __ [at p. 2228] (plur. opn. of Alito, J.) ["[o]ut-of-court statements that are *related by* the expert solely for the purpose of explaining the assumptions on which that opinion rests"], italics added; *id.* at p. __ [*id.* at p. 2255] (conc. opn. of Thomas, J.) ["the *disclosure* of Cellmark's out-of-court statements through the expert testimony"], italics added; *id.* at p. __ [*id.* at p. 2267] (dis. opn. of Kagan, J.) [considering whether "the *substance* of the report could come into evidence"], italics added.)  Our own high court's recent decisions

26

involving the intersection of the confrontation clause and expert basis evidence likewise demonstrate that Sixth Amendment concerns arise only where an expert witness communicates the substance of an out-of-court statement. (*People v. Dungo* (2012) 55 Cal.4th 608, 622 (conc. opn. of Werdegar, J.) [considering whether an expert's "repetition to the jury of anatomical and physiological observations [a pathologist] recorded in his [autopsy] report," on which the expert based his opinions, violated the confrontation clause]; *People v. Lopez* (2012) 55 Cal.4th 569, 576 [considering whether criminalist's testimony about the "contents" of a nontestifying analyst's laboratory report "violated defendant's right to confront [the analyst] at trial"].)

Thus, as a threshold matter, defendants must establish that Detective Kilmer conveyed the contents of out-of-court statements to the jury. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574-575 [party challenging judgment has burden to show reversible error].) This they fail to do. Defendants point to Detective Kilmer's testimony that his opinions were based, in part, on (1) in-custody and on-the-street conversations with gang members in which they voluntarily told him about gang rivalries as well as their lifestyle, customs, and motivations; (2) discussions with probation and parole officers about gang members who are on probation or parole; and (3) conversations with officers in other agencies in Santa Clara County about gang problems and gang members. But defendants cite no testimony in which Detective Kilmer disclosed "the content of those [conversations] or even stated with any particularity what [he] learned from those [conversations]." (*Johnson*, *supra*, 587 F.3d at p. 636 [finding no confrontation clause violation where expert relied on interviews with witnesses and cooperating defendants without referencing the substance of those interviews].) Defendants also complain that Detective Kilmer based his opinion that predicate offenses were committed by Palmas members on police reports and conversations with other officers. Again, however, our review of the record indicates Detective Kilmer never revealed the substance of those reports or conversations.

27

Because Detective Kilmer did not relate statements by out-of-court declarants to the jury, the admission of his testimony did not violate defendants' confrontation rights. We need not reach the questions of whether any of the out-of-court statements on which Detective Kilmer relied were testimonial or offered for their truth.[7]

### D.     *Instructional Error on Intent of Aider and Abettor*

Defendants Castro, Espana, and Rojas assert the trial court erred in instructing the jury regarding the intent required for aiding and abetting.

With respect to aiding and abetting liability, the trial court instructed the jury with CALCRIM Nos. 400 and 401. Pursuant to CALCRIM No. 400, the trial court instructed the jury that "[a] person is guilty of a crime whether he [or she] committed it personally or aided and abetted the perpetrator." The court instructed the jury pursuant to CALCRIM No. 401 that aiding and abetting requires knowledge of the perpetrator's intent to commit the crime and the specific intent to aid, facilitate, promote, encourage, or instigate the perpetrator's commission of the crime.[8] Defendants argue these instructions

---

[7] Incidentally, even if we attempted to address those issues, defendants' failure to point to specific out-of-court statements Detective Kilmer relayed to the jury would derail our analysis. Whether a particular out-of-court statement is testimonial is highly fact-specific. (*Michigan v. Bryant* (2011) 562 U.S. 344 [2011 U.S. Lexis 1713] [131 S.Ct. 1143, 1162] ["In determining whether a declarant's statements are testimonial, courts should look to all of the relevant circumstances."].) Given the record's silence as to the circumstances surrounding the various conversations on which Detective Kilmer relied, we would be required to resolve the issue against defendants. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [" 'All intendments and presumptions are indulged to support [the judgment] on matters as to which the record is silent, and error must be affirmatively shown.' "].)

[8] The jury was instructed with CALCRIM No. 401 in full: "To prove that the defendant is guilty of the crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] and[,][¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the (continued)

28

were deficient because they did not specify that aiding and abetting murder or attempted murder requires that the aider and abettor act with *intent to kill* and that aiding and abetting robbery requires that the aider and abettor act with *intent to steal*.

### 1. *Forfeiture and Standard of Review*

Defense counsel did not object to the jury instructions at trial. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.] But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1112.) Accordingly, we consider whether the challenged instruction--CALCRIM No. 401--incorrectly states the law, as defendants contend. Our review is de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

### 2. *Analysis*

In *People v. Beeman* (1984) 35 Cal.3d 547, 560, the court held that "an aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." As defendants concede, CALCRIM No. 401 is consistent with *Beeman*. However, they contend that two more recent California Supreme Court decisions--*People v. Lee* (2003) 31 Cal.4th 613 (*Lee*) and *People v. Mendoza* (1998) 18 Cal.4th 1114 (*Mendoza*)--require jurors to be

---

perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] [If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.]"

29

instructed that a defendant is guilty of aiding and abetting a specific intent crime only if he acted with the specific intent necessary to prove the underlying crime (i.e., specific intent to kill or to steal). We disagree.

In *Lee*, the court reaffirmed the holding of *Beeman* stating: "When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' " (*Lee*, *supra*, 31 Cal.4th at p. 624, quoting *Beeman*, *supra*, 35 Cal.3d at p. 560.) The *Lee* court went on to explain that, "[t]hus, to be guilty of attempted murder as an aider and abettor, . . . [one] must intend to kill." (*Lee*, *supra*, at p. 624.) It is this explanatory statement on which defendants rely. But, read in context, it is clear that *Lee* did not change the law. To the contrary, it approved the formulation of intent necessary to establish aiding and abetting stated in *Beeman* and incorporated into CALCRIM No. 401.

*Mendoza* provides even less support for defendants' contention that an aider and abettor must have the same specific intent as the perpetrator. There, the court explained that "[t]he mental state necessary for conviction as an aider and abettor . . . is *different* from the mental state necessary for conviction as the actual perpetrator. [¶] The actual perpetrator must have whatever mental state is required for each crime charged . . . . An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.] The jury must find 'the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense . . . .' " (*Mendoza*, *supra*, 18 Cal.4th at pp. 1122-1123, first italics added.)

30

Contrary to defendant's argument, the standard CALCRIM instructions given here on aiding and abetting accurately state the law.  Accordingly, we find no error.

### E.    *Rojas's Separate Appellate Contentions*

#### 1.    *Introduction of Rifle and Ammunition Evidence*

The jury heard evidence that a rifle and ammunition were found in Rojas's bedroom closet during a search of his home.  No evidence linking that firearm to any of the charged offenses was presented.  Rojas's trial counsel did not object to the admission of the rifle and ammunition.  On appeal, Rojas argues that evidence he possessed a rifle and ammunition was irrelevant and, hence, inadmissible.  He further maintains that his trial counsel's failure to object to the admission of that evidence constituted ineffective assistance.

Because Rojas's attorney did not object to admission of the weapon and ammunition, the claim of error has been waived.  (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1044.)  Nonetheless, we proceed to consider the merits of the claim in response to Rojas's contention of ineffective assistance of counsel.  " 'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome.  [Citations.]  A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.  Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.  [Citations.]  If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.  [Citation.]  . . .'  [Citation.]  'Failure to object rarely constitutes

31

constitutionally ineffective legal representation.' " (*People v. Gray* (2005) 37 Cal.4th 168, 206-207.)

Generally, "[w]hen the prosecution relies on evidence regarding a specific type of weapon, it is error to admit evidence that other weapons were found in the defendant's possession, for such evidence tends to show not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1056 [error to admit evidence of defendant's prior possession of handgun where prosecutor did not claim the weapon was used in charged murders]; see also *People v. Riser* (1956) 47 Cal.2d 566, 577 [error to admit evidence of a revolver found in defendant's possession where evidence showed a different weapon was used in the crime], overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648-649; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392-1393 [error to admit evidence of knives that were not murder weapon].) In other words, "[e]vidence of possession of a weapon not used in the crime charged against a defendant leads logically only to an inference that defendant is the kind of person who surrounds himself with deadly weapons--a fact of *no relevant* consequence to determination of the guilt or innocence of the defendant." (*People v. Henderson* (1976) 58 Cal.App.3d 349, 360.) However, "when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible." (*People v. Cox* (2003) 30 Cal.4th 916, 956, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, the rifle evidence was not relevant to Rojas's commission of any of the charged crimes. However, in view of Detective Kilmer's testimony concerning the habits of gang members pertaining to their possession and use of weapons, we agree with the People that the evidence was at least minimally relevant to prove the truth the gang enhancement allegations. Arguably, the evidence also was relevant to Rojas's credibility, as he testified that he never carried a gun. Because the evidence had some probative value, the question becomes whether, under Evidence Code section 352, that probative

32

value was substantially outweighed by the prejudicial effect of the rifle and ammunition evidence. We conclude that it was not, under the facts of this case.

With respect to prejudice, "we are concerned only with the possibility of an emotional response to the proposed evidence that would evoke the jury's bias against defendant as an individual unrelated to his guilt or innocence." (*Gunder*, *supra*, 151 Cal.App.4th at p. 417.) An emotional response by jurors to the gun possession evidence was unlikely here because the crimes with which Rojas was charged all involved firearms and other properly admitted evidence indicated that Rojas carried a firearm at times. In particular, police found the nine-millimeter Smith & Wesson pistol along the path Rojas took in fleeing police following the Giusti Drive shooting; Jeremy Rosario testified he had seen Rojas in possession of a gun; Delreal testified that he had seen Rojas shoot at people on one occasion (the Poco Way shooting) and that Rojas had admitted carrying out three other shootings (the Waverly Avenue, San Tomas Aquino Parkway, and Virginia Avenue shootings); and a victim of the Poco Way shooting identified Rojas as one of the shooters. (See *Riser*, *supra*, 47 Cal.2d at pp. 577-578 [no prejudice in admitting evidence of other firearm and ammunition possessed by defendant when jury would have concluded from other, properly admitted evidence that defendant possessed firearms]; *Gunder*, *supra*, at p. 417 [no undue prejudice in admission of evidence of defendant's prior firearm possession when firearm possession was "inherent in the offenses at issue"].) Because we discern no undue prejudice, we find no error in the admission of the evidence.

33

## 2.    *Sufficiency of the Evidence Corroborating Accomplice Testimony*

Rojas contends his convictions on counts 9, 10, and 14 must be reversed because they are based on the testimony of an accomplice, Delreal, which was not sufficiently corroborated under section 1111.[9]

Section 1111 provides, in relevant in part:  "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."  To be sufficient, corroborating evidence must, " 'without aid or assistance from the testimony of the accomplice, tend[] to connect the defendant with the crime charged.' "  (*People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1128.)  Put differently, corroborating evidence " ' " " 'must relate to some act or fact which is an element of the crime[, although] it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' " ' "  (*Ibid.*)  Corroborating evidence may be circumstantial and so slight as to be " ' " " 'entitled to little consideration when standing alone.' " ' "  (*Ibid.*)  It " ' "is sufficient if it substantiates enough of the accomplice's testimony to establish his credibility." ' "  (*Ibid.*)

---

[9] Counts 9 and 10 related to the San Tomas Aquino Parkway shooting and charged Rojas with the murder of Rigoberto and the attempted murder of Hernandez, respectively.  As discussed above, Delreal testified that Rojas told him that he, Espana, and Washington were involved in a shooting near San Tomas Aquino Parkway.  Rojas told Delreal that Washington approached an individual who was getting out of a car, asked if he was a Sureño, and then shot the individual.  Rojas shot the man after he was on the ground.  Espana drove them away in Castro's truck.  Castro was not there because he was with his girlfriend.  Count 14 charged Rojas with the Virginia Avenue murder of Martinez.  Delreal testified that Rojas said he "unloaded the clip on" an individual on Virginia Avenue while he, Castro, Espana, and another individual were out in Castro's brother's car.

The jury was instructed that Delreal was an accomplice, such that it could not convict defendants on his testimony alone.  (See CALCRIM No. 335.)  The parties do not dispute the propriety of that instruction.

In this case, we conclude that sufficient corroborating evidence was introduced connecting Rojas with the San Tomas Aquino Parkway shooting. First, independent evidence connected Rojas to the weapon used in the San Tomas Aquino Parkway shooting. Specifically, a Santa Clara County criminalist testified that the nine-millimeter Smith & Wesson pistol police recovered on the path Rojas took in fleeing police after the Giusti Drive shooting was used in the San Tomas Aquino Parkway shooting. Second, cell phone records corroborated Rojas's connection to the crimes charged in counts 9 and 10 by placing him in the vicinity of the shooting at the approximate time it occurred. Third, independent evidence of Rojas's motive was admitted--(1) Rojas admitted to being a member of the Palmas gang; (2) Detective Kilmer testified that a rivalry existed between Palmas and Sureños that had become particularly violent prior to the San Tomas Aquino Parkway shooting; and (3) victim Hernandez testified that the shooters asked Rigoberto what neighborhood he belonged to before shooting, indicating the shooting was gang-related. Having presented independent evidence of Rojas's possession of the murder weapon, presence near the scene at the time the shooting occurred, and motive, the People adequately corroborated Delreal's testimony. (*People v. McDermott* (2002) 28 Cal.4th 946, 986 [independent evidence of defendant's motive and presence at the scene adequately corroborated accomplice testimony].)

We likewise conclude that sufficient corroborating evidence was introduced connecting Rojas to the Virginia Avenue shooting. First, the criminalist's testimony connected Rojas to the weapon used in the Virginia Avenue shooting, testifying that it was the same gun police recovered on the path Rojas took in fleeing police after the Giusti Drive shooting. Second, physical evidence corroborated Delreal's testimony that Rojas "unloaded the clip," as officers found 10 shell casings at the scene, and the victim had at least six bullet wounds. Third, Delreal's testimony that the shooters were driving Castro's brother's car was corroborated by evidence that Gilbert Castro drove a Stratus and eyewitness testimony that the shooters left in a Stratus. Fourth, Castro's statement to

35

his other brother, Juan, corroborated portions of Delreal's testimony--namely, that Castro was present and that Gilbert's Stratus was the getaway vehicle. Finally, as with the San Tomas Aquino Parkway shooting, independent evidence of Rojas's motive was admitted--(1) Rojas admitted to being a member of the Palmas gang; (2) Detective Kilmer testified that a rivalry existed between Palmas and Sureños that had become particularly violent prior to the Virginia Avenue shooting; (3) the shooting occurred in a Sureño neighborhood; and (4) the victim was a Sureño.

### 3. *Constitutionality of Rojas's Sentence*

The trial court sentenced Rojas--who was 17 years old at the time of the offenses--to two consecutive terms of life imprisonment (one without the possibility of parole), plus an additional consecutive term of 175 years to life. The court imposed that sentence pursuant to section 190.5, subdivision (b), which had, at the time, "been construed . . . as creating a presumption in favor of life without parole as the appropriate penalty for juveniles convicted of special circumstance murder." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1360 (*Gutierrez*), citing *People v. Guinn* (1994) 28 Cal.App.4th 1130.) After Rojas was sentenced, the United States Supreme Court ruled that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " (*Miller v. Alabama* (2012) 567 U.S. __ [2012 U.S. Lexis 4873] [132 S.Ct. 2455, 2460].) On appeal, Rojas argues his sentence violates the Eighth Amendment under the principles announced in *Miller*.

After briefing was completed in this case, our Supreme Court considered, in *Gutierrez*, the impact of *Miller* on section 190.5, subdivision (b). The *Gutierrez* court held that, "properly construed, [that provision] confers discretion on a trial court to sentence a 16- or 17-year-old juvenile convicted of special circumstance murder to life without parole or to 25 years to life, *with no presumption* in favor of life without parole." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1360, italics added.) The court further held "that

36

*Miller* requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender." (*Id.* at p. 1361.) More specifically, the court construed *Miller* as requiring a sentencing court to admit and consider relevant evidence of five factors: (1) the inherent impact of the juvenile's age on his culpability; (2) the juvenile's family and home environment; (3) the circumstances of the homicide offense, including the impact of familial and peer pressures and substance abuse; (4) the juvenile's ability to deal with law enforcement officers and prosecutors as well as effectively assist in his own defense; and (5) the possibility of rehabilitation. (*Id.* at pp. 1388-1390.) In *Gutierrez*, "[b]ecause the two defendants . . . were sentenced before *Miller* in accordance with the interpretation of section 190.5[, subdivision] (b) prevailing at the time," the court remanded for resentencing. (*Id.* at p. 1361.) We likewise remand to the trial court with directions to resentence Rojas in accordance with *Miller* and *Gutierrez*.

### F. Joseph Abeyta's "Hot Ones" Testimony

Espana argues the trial court erred by admitting Abeyta's testimony regarding Espana having "hot ones" under his belt pursuant to the adoptive admission exception to the hearsay rule. We review the court's admission of the statement as an adoptive admission for abuse of discretion. (*People v. Waidla*, *supra*, 22 Cal.4th at p. 725.)

Evidence Code section 1221, which codifies the hearsay exception for adoptive admissions, provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." " 'To warrant admissibility [under the adoptive admission exception], it is sufficient that the evidence supports a reasonable inference that an accusatory statement was made under circumstances affording a fair opportunity to deny

37

the accusation; whether defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189-1190.) A direct accusation is not required; only a statement " 'under circumstances that would normally call for a response if the statement were untrue' " is required. (*Id.* at p. 1189.) Accordingly, the question before us is whether a reasonable jury could have inferred that the "hot ones" statement was made under circumstances that (1) would normally call for a denial if it was untrue and (2) afforded Espana a fair opportunity to assert such a denial. If these inferences were reasonable, then it was up to the jury to decide whether Espana's conduct in response to the statement constituted an adoptive admission of its truth.

Espana maintains that neither of the requisite inferences was reasonable. First, the circumstances did not call for a denial if the statement was untrue because gang culture glorifies murder, such that the statement was a compliment. Second, Espana contends he had no opportunity to deny the accusation because gang culture prohibited him from contradicting the speaker, who was above him in the Norteño hierarchy. We agree. The only reasonable inference to be drawn from the evidence--specifically, the testimony of Mendoza, Tirri, and Detective Kilmer about gang dynamics--is that the "hot ones" statement was made under circumstances that did *not* call for a response if it was untrue. The trial court therefore erred in admitting the statement as an adoptive admission.

The erroneous admission of that evidence requires reversal only if we determine it was prejudicial. With respect to each of Espana's convictions, the court's error was harmless under either the harmless-beyond-a-reasonable-doubt test (*Chapman v. California* (1967) 386 U.S. 18, 24) that applies to errors violative of the United States Constitution, or the reasonable-probability test (*People v. Watson*, *supra*, 46 Cal.2d at pp. 836-837) that applies to error under California law.

There was overwhelming evidence of Espana's guilt of Koba's murder on Giusti Drive, charged in count 15. A police officer observed Espana and Rojas approach the

38

victim and shoot him, flee the scene, and attempt to flee officers. And Koba's wallet was found on the ground where Espana was seated after his arrest. Accordingly, the record demonstrates beyond a reasonable doubt Espana would not have obtained a more favorable verdict on count 15 had the "hot ones" comment been excluded.[10]

As to counts 9 and 10, the evidence before the jury included the testimony of Delreal and Rosario, who learned of Espana's presence at the San Tomas Aquino Parkway shooting from Rojas and Washington, respectively. Jurors also heard from the surviving victim, who testified that he recognized Espana "a little bit" as one of the shooters. Circumstantial evidence also implicated Espana, including ballistics evidence indicating that the gun used in the San Tomas Aquino Parkway shooting was the same one used in the Giusti Drive shooting, at which Espana was present. Cell phone records placed Espana within two miles of the location of the shooting about 10 minutes before it occurred, and indicated that he went to the east side of San Jose, where he lived, immediately after.[11] Evidence of Espana's gang membership and evidence supporting the inference that the San Tomas Aquino Parkway shooting was gang-motivated (e.g., the surviving victim's testimony that the shooter asked what neighborhood the decedent belonged to and Detective Kilmer's testimony that the area was frequented by Sureños), further implicated him in the shooting.

---

[10] Espana's counsel conceded this at oral argument.

[11] We disagree with Espana that cell phone records definitively disprove his presence at the San Tomas Aquino Parkway shooting. The records indicate that seven minutes after the first 911 call about the shooting Espana's phone connected to a tower nine miles east of where the shooting occurred. Espana relies heavily on Detective Prichard's testimony that it took him eight minutes to drive from the crime scene to the location of the east San Jose cell tower, traveling at speeds between 80 and 90 miles per hour. According to Espana, that testimony indicates he could not have been at the shooting. But that is true only if one assumes the shooting was reported immediately, even before the shooters drove away, and the shooters obeyed the speed limit as they fled. Neither inference is compelled by the evidence or common sense.

Meanwhile, evidence of the "hot ones" comment likely had little impact, in view of other evidence before the jury. As Espana himself notes, the supposed adoptive admission did not implicate him in any particular incident, but instead suggested he had been involved in more than one murder. Other evidence supported the same inference. In particular, Tirri testified that Espana said he and his boys had already "dropped some bodies" prior to the Giusti Drive shooting. Phone calls Espana made from jail, which were played for the jury and admitted into evidence, also indicated the Giusti Drive shooting was not an isolated incident. In one phone call shortly after his arrest Espana told a friend that the police "know about fucking hella shit" and that police were "waiting until we slip." In a later call, Espana reiterated that the police "know a lot" so "all the homeys" should be careful. On this record, we have no reasonable doubt the jury would have convicted Espana in connection with the San Tomas Aquino Parkway shooting even absent his silent admission to unspecified murders.

On the count 14 Virginia Avenue murder charge, the evidence against Espana included Delreal's testimony that Rojas stated Espana was involved in the shooting. Details of Delreal's account--including that the shooters were in Castro's brother's car and that the victim was shot multiple times--were corroborated by eyewitness testimony and physical evidence. Tirri testified that defendant Espana admitted to being involved in a shooting that occurred around the time of the Virginia Avenue shooting in which Castro was driving his brother's Stratus. As with the San Tomas Aquino Parkway shooting, ballistics evidence indicating the same gun was used in the Virginia Avenue shooting and the Giusti Drive shooting and gang evidence implicated Espana in the Virginia Avenue murder. Our review of this evidence, and the fact (discussed above) that the "hot ones" comment likely had minimal impact given other properly admitted evidence, convinces us that the court's error was harmless.

40

Finally, in view of the foregoing discussion, we conclude the court's erroneous admission of evidence of the "hot ones" comment was harmless beyond a reasonable doubt as to Espana's conspiracy conviction as well.

### G. *Sufficiency of the Evidence of Castro's Guilt*

Castro urges us to reverse his convictions on counts 7, 8, 9, 10, and 15 on grounds of insufficient evidence.

#### 1. *Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*Ibid.*)

Castro was tried on the theory that he aided and abetted the offenses at issue. As discussed above, aiding and abetting requires both "knowledge of the unlawful purpose of the perpetrator" and the "intent or purpose of committing, facilitating or encouraging commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) Further, the aider and abettor must commit an act that "in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Accordingly, at issue is whether there was substantial evidence that, for each count, Castro had the requisite knowledge and intent and took the requisite act.

#### 2. *Counts 7 and 8--the Waverly Avenue Shooting*

With respect to the shooting on Waverly Avenue, Castro contends that, at best, the evidence establishes that he attended the party where shots were fired. He asserts, however, that there is no evidence he committed any act assisting the attempted murders or shared in the shooters' intent to kill. We disagree.

41

Viewed in the light most favorable to the prosecution, there was credible and solid evidence supporting the reasonable inference that Castro committed an act encouraging the shooting--namely, acting as getaway driver for the shooters. On the night of the Waverly Avenue shooting, eyewitness Yesenia Ramirez told police that the shots were fired from two vehicles, one of which she described as a dark blue or dark green pickup truck. Castro drove a dark green Toyota Tacoma truck, which was used as the getaway vehicle in the Hamilton Avenue, San Tomas Aquino Parkway, and Giusti Drive shootings. Delreal testified that Rojas admitted to being one of the shooters at the party and told Delreal that Castro also attended the party. Castro's presence at the party was confirmed by eyewitness Crisostomo. Delreal's testimony also put Castro with Rojas-- one of the shooters--shortly after the shooting, when they stopped by Delreal's house. From the foregoing evidence, jurors reasonably could infer that Castro aided the shooters by driving them away from the party. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [" '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense' "].)

Substantial evidence also supports the reasonable inferences that Castro knew of the shooters' unlawful purpose and intended to aid them in committing the attempted murders. That knowledge and intent can be inferred from (1) evidence the shooting was carried out by Palmas members on Sureños because Sureños were on Palmas turf; (2) evidence that, the month prior to the shooting, Castro had attended a Palmas meeting in which Sanchez encouraged gang members to shoot Sureños; and (3) the inference discussed above that Castro acted as the getaway driver. (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1049 ["Evidence of the defendant's gang affiliation . . . can help prove . . . specific intent"].) In sum, the circumstances of the shooting, especially the gang context, provide substantial evidence supporting an inference Castro intended to aid and abet the attempted murders.

42

### 3. *Counts 9 and 10--the San Tomas Aquino Parkway Shooting*

Castro concedes there is sufficient evidence that the San Tomas Aquino Parkway shooters used his truck as a getaway vehicle. However, given Castro's undisputed absence from the scene of the shooting, he maintains there was no evidence that he loaned the shooters his truck with the knowledge that they intended to kill and the intent to facilitate such killing. Once again, we disagree.

Solid evidence supported the inference that the San Tomas Aquino Parkway shooting was gang-related. In particular, the surviving victim testified that the shooter asked, in Spanish, what neighborhood the decedent belonged to before shooting. Delreal confirmed that the shooter sought to determine whether the victim was a Sureño. And Detective Kilmer testified that the area was frequented by a Sureño street gang. Jurors also heard evidence indicating that the shooting was carried out by members of Palmas, including evidence that Rojas admitted the shooting to Delreal, Rosario's testimony that Washington was involved in the shooting, and ballistics evidence that the gun used was the same one police found after the Giusti Drive shooting and that was also used in the shootings on Waverly Avenue, Poco Way, Virginia Avenue, and Giusti Drive. Finally, evidence indicated Castro's truck was used as the getaway vehicle following more than one of those other shootings. Taken together, the jury reasonably could infer that Castro lent his truck to his fellow Palmas members with the knowledge that they intended to go out "scrap hunting," and with the intent to facilitate that endeavor.

### 4. *Count 15--the Giusti Drive Shooting and Robbery*

Finally, Castro argues there is insufficient evidence he shared in Espana and Rojas's intent to rob Koba, as there was no evidence Espana and Rojas formed that intent until after they exited Castro's truck. We agree.

Contrary to the People's argument, Delreal's testimony does not reasonably support the inference that the group as a whole decided to rob Koba. Delreal testified that Rojas said he and Espana approached Koba in order to rob him. But that testimony

43

provides no insight into when they formed that intent or whether Castro had any knowledge of it. Nor does any other evidence suggest Rojas, Espana, and Castro planned to rob Koba. Rather, the evidence suggests they were looking for Sureños or drugs.

Castro, as the getaway driver, certainly was not blameless. He could have been charged as an accessory after the fact or for aiding and abetting the robbery. (*People v. Cooper*, *supra*, 53 Cal.3d at pp. 1161, 1168; *id*. at p. 1161 ["a getaway driver who has no prior knowledge of a robbery, but who forms the intent to aid in carrying away the loot during such asportation, may properly be found liable as an aider and abettor of the robbery"].) But absent any evidence tending to support the inference that he shared the intent to rob Koba, his conviction for felony murder cannot stand. (*People v. Pulido* (1997) 15 Cal.4th 713 [complicity in a felony murder does not extend to one who joins the felonious enterprise after the killing has been completed].)

### H. *Cumulative Error*

Defendants assert the cumulative impact of the individual assigned errors was to deny them due process, thereby warranting reversal of their respective judgments. We found the court erroneously admitted Abeyta's "hot ones" testimony, that recent developments in Eighth Amendment law require that Rojas be resentenced, and that the guilty verdict against Castro on count 15 is unsupported by substantial evidence. We have found no merit in the remainder of defendants' claims of error. Accordingly, we find no cumulative prejudice to defendants and reject their claims that the trial was constitutionally defective.

## III. DISPOSITION

The judgment against Sanchez is affirmed.

The judgment against Rojas is reversed and the matter is remanded to the trial court for resentencing in accordance with *Miller* and *Gutierrez*.

The judgment against Espana is affirmed.

44

The judgment against Castro is reversed and the matter is remanded to the trial court. The trial court is directed to vacate Castro's conviction on count 15 and to resentence him on counts 2, 3, 4, 7, 8, 10, and 14.

_____
                              Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Elia, J.


People v. Sanchez et al.
H037353

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 211268 |
| Trial Judge: | Hon. Arthur Bocanegra |
| Counsel for Plaintiff/Respondent:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Dane R. Gillette<br>Chief Assistant Attorney General<br><br>Gerald A. Engler<br>Senior Assistant Attorney General<br><br>René A. Chacon<br>Supervising Deputy Attorney General<br><br>Nanette Winaker<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>Gene Sanchez | Law Offices of John P. Dwyer<br>John P. Dwyer |
| Counsel for Defendant/Appellant:<br>Samuel Castro | Under appointment by the Court of Appeal<br>Kyle Gee |
| Counsel for Defendant/Appellant:<br>Michael Espana | Under appointment by the Court of Appeal<br>David D. Martin |
| Counsel for Defendant/Appellant:<br>Orlando Rojas | Under appointment by the Court of Appeal<br>J. Frank McCabe |

People v. Sanchez et al.
H037353